SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Chief Assistant for Trials, Integrity & Professionalism
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2432
     Facsimile: (213) 894-6269
     E-mail:    ranee.katzenstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>JONATHAN TODD SCHWARTZ,<br><br>          Defendant. | No. CR 17-22-DMG<br><br>GOVERNMENT'S COMBINED<br>(1) CONCURRENCE IN THE FINDINGS<br>OF THE PRESENTENCE REPORT; AND<br>(2) POSITION RE SENTENCING;<br><br>DECLARATION OF RANEE A.<br>KATZENSTEIN AND EXHIBITS THERETO;<br><br>VICTIM IMPACT LETTER FROM BERNARD<br>GUDVI<br><br>[ADDITIONAL VICTIM IMPACT LETTERS<br>FILED SEPARATELY UNDER SEAL]<br><br>Hearing Date: May 3, 2017<br>Hearing Time: 3:00 p.m.<br>Location:     Courtroom of the<br>              Hon. Dolly M. Gee |

        Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

of California and Assistant United States Attorney Ranee A.

Katzenstein, hereby files its Combined (1) Concurrence in the

Findings of the Presentence Report; and (2) Position re Sentencing
("Sentencing Position").

        This Sentencing Position is based upon the attached memorandum
of points and authorities; the attached declaration of Ranee A.
Katzenstein and exhibits thereto; the attached letter from Bernard
Gudvi, the founding partner of victim GSO Business Management, LLC
("GSO"); the victim impact letters from other partners and employees
of GSO filed separately under seal; the file and record in this case;
and such further evidence and argument as the Court may permit.

Dated: April 19, 2017            Respectfully submitted,

                                 SANDRA R. BROWN
                                 Acting United States Attorney

                                 LAWRENCE S. MIDDLETON
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/ _Ranee A. Katzenstein_
                                 RANEE A. KATZENSTEIN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

**Contents**

TABLE OF AUTHORITIES..............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................2

      A.    Defendant's Admissions (factual basis for pleas)..........2

      B.    The Offense Conduct...................................5

            1.    Overview........................................5

            2.    Victims/Losses..................................6

III.  CONCURRENCE IN THE FINDINGS OF THE PRESENTENCE REPORT.........8

IV.   GOVERNMENT'S POSITION RE SENTENCING.........................8

      A.    Advisory Sentencing Guidelines.........................8

            1.    Stipulations of the Parties........................8

            2.    Wire Fraud:  The 18-level Enhancement for Loss
                  Applies Because the Loss was Greater than $3.5
                  Million........................................9

            3.    Wire Fraud: The Abuse of Position of Trust
                  Enhancement Applies Because Defendant Had Access
                  To His Clients' Accounts By Virtue of Being Their
                  Business Manager..............................9

            4.    Subscription to False Tax Return: Tax Loss.........11

            5.    Unreported Income from Criminal Activity...........12

            6.    A 2-Level Multiple-Count Adjustment Applies........12

            7.    Summary.......................................18

      B.    Analysis of the § 3553(a) Factors.....................19

            1.    Nature and Circumstances of the Offense............20

            2.    History and Characteristics of Defendant...........22

                  a.    Acceptance of Responsibility...............22

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                                   <u>PAGE</u>

                    b.    The Court should reject any request by
                          defendant for a variance based on his
                          purported gambling and drug addictions.........23

            3.    Goals of Sentencing.................................25

      C.    Government's Sentencing Recommendation...................26

V.    CONCLUSION....................................................27

DECLARATION OF RANEE A. KATZENSTEIN................................28

EXHIBITS    ..........................................................30

LETTER FROM BERNARD GUDVI.........................................49

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

Federal Cases

<u>United States v. Astorri</u>,
    923 F.2d 1052 (3d Cir. 1991) .................................. 16

<u>United States v. Bates</u>,
    166 F. App'x. 972 (9th Cir. 2006) ............................ 13

<u>United States v. Christiansen</u>,
    958 F.2d 285 (9th Cir. 1992) ................................. 10

<u>United States v. Dikiara</u>,
    50 F. Supp. 3d 1029 (E.D. Wis. 2014) ......................... 24

<u>United States v. Doxie</u>,
    813 F.3d 1340 (11th Cir. 2016) ........................... 16, 18

<u>United States v. Gordon</u>,
    291 F.3d 181 (2d Cir. 2002) .......................... 16, 18, 24

<u>United States v. Haltom</u>,
    113 F.3d 43 (5th Cir. 1997) .................................. 17

<u>United States v. Hendricks</u>,
    434 F. App'x. 812, 2011 WL 2749814 (11th Cir. 2011) .......... 11

<u>United States v. Lindsay</u>,
    184 F.3d 1138 (10th Cir. 1999) ............................... 18

<u>United States v. Martin</u>,
    363 F.3d 25 (1st Cir. 2004) .......................... 16, 17, 18

<u>United States v. Morris</u>,
    229 F.3d 1145, 2000 WL 1260162 (4th Cir. 2000) ............... 16

<u>United States v. Peterson</u>,
    312 F.3d 1300 (10th Cir. 2002) ............................... 16

<u>United States v. Seligsohn</u>,
    981 F.2d 1418 (3d Cir. 1992) ................................. 18

<u>United States v. Shevi</u>,
    345 F.3d 675 (8th Cir. 2003) ................................. 18

<u>United States v. Smith</u>,
    424 F.3d 992 (9th Cir. 2005) ................................. 13

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

United States v. Vitale,
   159 F.3d 810 (3rd Cir. 1998).........................................16

United States v. Vucko,
   473 F.3d 773 (7th Cir. 2007)............................14, 15, 18

Weinberger v. United States,
   268 F.3d 346 (6th Cir. 2001)................................16, 18

Federal Statutes

18 U.S.C. § 1343...............................................1, 8, 14

18 U.S.C. § 3553(a)..............................................19, 22

26 U.S.C. § 7206(1)...........................................1, 8, 14

28 U.S.C. § 994(i)(2)................................................14

Federal Rules

USSG § 2B1.1(a)(1)....................................................8

USSG § 2B1.1(b)(1)(J)..............................................8, 9

USSG § 2T1.1.........................................................8

USSG § 2T1.1(b)(1)................................................8, 13

USSG § 3B1.3....................................................8, 9, 10

USSG § 3D1.1........................................................12

USSG § 3D1.2..................................................passim

USSG § 3D1.3........................................................12

USSG § 3D1.4........................................................12

USSG § 5K1.1........................................................22

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Over the course of seven years, defendant JONATHAN TODD SCHWARTZ ("defendant") embezzled over $7 million from his clients while simultaneously assuring them he was properly managing their financial affairs and looking out for their interests.  He falsified records and forged at least one client's signature to conceal these thefts, and lied to his clients and his firm when he was confronted about the missing funds.  Defendant's conduct harmed not only the clients whose money he stole, but also the business management firm of which he was a partner, whose insurance policies did not cover all the losses defendant caused and, perhaps even more importantly, whose otherwise stellar reputation was damaged by defendant's criminal acts resulting in the loss of current business and future business.  The harms caused by defendant's conduct do not stop there:  As a result of the losses that defendant's conduct caused his former firm, the firm had to lay off many employees who have now lost their own livelihoods, drastically impacting their own lives and the lives of their families.

On February 2, 2017, defendant pled guilty pursuant to a plea agreement to an information charging him with a violation of the wire fraud statute, 18 U.S.C. § 1343, arising from this embezzlement scheme, and failing to report the stolen money on his tax returns, in violation of 26 U.S.C. § 7206(1).  (CR 15.)[1]

---

[1] "CR" refers to the Clerk's Record of Proceedings and is followed by the applicable docket number.  "Exh." refers to the exhibits attached to the Declaration of Ranee A. Katzenstein ("Katzenstein Dec.").

In the Presentence Report ("PSR"), the Probation Officer found that defendant's total post-acceptance offense level is 26, based on the offense levels for each count to which the parties stipulated in the plea agreement and application of the multi-count adjustment under USSG §§ 3D1.1-3D1.4.  Defendant is in Criminal History Category I.  At offense level 26, defendant's advisory sentencing guidelines range is 63 to 78 months.

Defendant's crimes were extremely harmful, egregious, long-standing, and motivated by selfish greed.  In mitigation, defendant has admitted his wrongful conduct and accepted responsibility for the harm he caused.  The government respectfully submits that the aggravating and mitigating factors in this case, discussed more fully below, are appropriately balanced by a sentence of 63 months in custody, the low end of the applicable advisory guidelines range, followed by three years of supervised release; in addition, defendant should be ordered to pay restitution in the total amount of $8,657,268 to the individual victims and GSO Business Management, LLC, as set forth in the PSR.

## II.    STATEMENT OF FACTS

### A.    Defendant's Admissions (factual basis for pleas)

Defendant admitted the following facts in his written plea agreement and under oath in open court at the hearing on his change of plea:

*Background*

*At all times relevant to the Information:*

*Defendant was a resident of Agoura Hills, within the Central District of California.  Defendant was a member of GSO Business Management, LLC ("GSO"), a business management firm based in Sherman Oaks, California.  GSO provided financial guidance, including managing bank accounts, providing accounts*

2

payable services on clients' behalf, and preparing short term
and long term budgets.

*The Scheme to Defraud*

Beginning by at least March 2009 and continuing until at
least May 2016, defendant executed a scheme to defraud clients
of GSO by taking for his own use monies belonging to the clients
without the knowledge or authorization of the clients;
falsifying records of the clients' accounts to conceal the
unauthorized takings; forging the signature of one client on GSO
receipts, thereby creating the false appearance that cash
withdrawn from the client's account had been delivered to the
client; and, when confronted, lying about what he had done with
the missing cash.

Specifically, between March 2009 and April 2010, defendant
withdrew cash belonging to Client No. 1 without the knowledge,
consent, or authorization of Client No. 1.  Defendant withdrew
the cash, totaling $1,009,000, in 28 unauthorized transactions
at City National Bank.  Client No. 1 was rebuilding his home
during this period and defendant falsely coded a number of the
unauthorized cash withdrawals as home renovations on the
accounting records GSO maintained for Client No. 1.

Between at least May 2010 and January 2014, defendant
withdrew cash belonging to Client No. 2 without the knowledge,
consent, or authorization of Client No. 2.  Defendant withdrew
the cash, totaling approximately $4.8 million, in 114
unauthorized transactions.  Defendant falsely coded the
unauthorized cash withdrawals as "sundry/personal expenses" on
the accounting records GSO maintained for Client No. 2.  When
confronted about the missing funds, defendant falsely stated
that the money was an "investment" in illegal marijuana "grow"
businesses and that he and other GSO employees, none of whom
defendant could identify, had delivered the cash to people, also
unidentified, associated with the marijuana businesses.
Although defendant claimed that Client No. 2 had signed "meeting
packets" acknowledging the cash transactions, no such signed
meeting packets in fact exist.

Between September and December 2014, and again in February
2016, defendant withdrew cash belonging to Client No. 3 without
the knowledge, consent, or authorization of Client No. 3.
Defendant withdrew the cash, totaling $737,500, in 10
unauthorized transactions.  Defendant forged Client No. 3's
signature on at least two cash receipts pertaining to
transactions on November 25, 2014 (for $150,000) and December
16, 2014 (for $100,000).

Between October and November 2014, defendant withdrew cash belonging to Client No. 4 without the knowledge, consent, or authorization of Client No. 4. Defendant withdrew the cash, totaling $122,500, in 4 unauthorized transactions.

In 2015, defendant obtained $500,000 from Client No. 5, based on defendant's representation and promise that he would invest Client No. 5's money on Client No. 5's behalf and would provide the interest from the investment to Client No. 5. Defendant did not invest Client No. 5's money as promised. In 2016, defendant returned $75,000 to Client No. 5 as "interest"; misappropriated the remaining $425,000 of Client No. 5's money; and, without Client No. 5's knowledge or consent, used it to pay defendant's own expenses.

In March 2016, defendant obtained $100,000 belonging to Client No. 6 in an unauthorized transaction. When confronted, defendant promised to "take care of" the claim, but did not.

*Use of the Wires*

In furtherance of the fraudulent scheme, on or about December 11, 2013, defendant caused a communication to be sent via interstate wires, namely an e-mail from defendant's GSO e-mail account in California sent to City National Bank, in California, via a Network Solutions, LLC, server located in Jacksonville, Florida, approving an attached "Request For Cash/Cashier's Check/Foreign Currency" for $97,500 in cash to be withdrawn from the account of Client No. 2, which was submitted by defendant and stated that defendant would pick up the cash at the Beverly Hills Branch of the bank.

*Subscription to a False Tax Return*

On or about October 15, 2013, defendant signed and submitted to the Internal Revenue Service a United States Individual Income Tax Return, Form 1040, for tax year 2012 on which he reported, on line 22, that he had total income of $626,228. At the time that defendant signed the return and submitted it to the IRS he knew that he had additional income for tax year 2012 of approximately $1,621,500 and knew that he had a legal duty to disclose this additional income to the IRS.

(Plea Agreement (Exhibit C: Factual Basis) (CR 6); for the Court's convenience, a copy of the factual basis is attached to the Katzenstein Dec. as Exh. A.)

4

1    **B.    The Offense Conduct**

2        1.    Overview

3        Defendant was a member of GSO Business Management, LLC ("GSO"),

4    a business management firm based in Sherman Oaks, California.    GSO

5    provided financial guidance, including managing bank accounts,

6    providing accounts payable services on clients' behalf, and preparing

7    short term and long term budgets.    (PSR ¶ 11.)    Defendant embezzled

8    approximately $7.2 million from his GSO clients, and then failed to

9    report this income on his own tax returns.    (PSR ¶¶ 20-21.)

10        Due to his position as his clients' business manager, defendant

11   had access to his clients' bank accounts for the purpose of paying

12   their bills and obtaining cash for them at their request.    In fact,

13   defendant submitted requests to the bank for cash that were not

14   authorized by the clients, and had the bank deliver the cash to him

15   or picked the cash up from the bank himself.    (E.g., Exh. B.)

16   Defendant was able to conceal the embezzlements because, per GSO

17   procedure, the bank statements were sent to GSO, not to the clients.

18   GSO prepared monthly statements for the clients based on a ledger of

19   expenses that GSO bookkeepers maintained.    Defendant provided false

20   information to the bookkeepers and caused other, pertinent

21   information to be deleted from the monthly statements.    (E.g., Exh.

22   C.)    The concealment succeeded because (a) the clients trusted

23   defendant, whom they had hired specifically for the purpose of

24   protecting their assets; and (b) the clients were high net worth

25   individuals for whom the losses would not necessarily be immediately

26   noticeable.

27

28

2.   <u>Victims/Losses</u>

*Client No. 1*:  Between March 2009 and April 2010, defendant withdrew $1,009,000 of Client No. 1's money in 28 unauthorized transactions at City National Bank.  (PSR ¶ 13.)  Defendant concealed these embezzlements by causing a number of these transactions to be falsely entered into GSO's books as cash provided to the client to pay for home renovations.  (PSR ¶ 13.)

*Client No. 2*:  Between May 2010 and January 2014, defendant withdrew $4,800,000 of Client No. 2's money in 114 unauthorized transactions.  (PSR ¶ 14.)  Defendant concealed these embezzlements by causing a number of these transactions to be falsely entered into GSO's books as cash provided to the client for sundry/personal expenses.  (<u>Id.</u>)  When confronted, defendant attempted to lull Client No. 2 by falsely claiming that the cash had been invested in a marijuana business.  (<u>Id.</u>)  Defendant also falsely told Client No. 2's business manager that Client No. 2 had signed for the cash.  (<u>Id.</u>)

*Client No. 3*:  Between September and December 2014, defendant withdrew $737,500 of Client No. 3's money in 10 unauthorized transactions.  (PSR ¶ 15.)  Defendant forged Client No. 3's signature on at least two cash receipts in order to create the false pretense that Client No. 3 had received the cash.  (PSR ¶ 15; Exh. B at 5, 7.)

*Client No. 4*:  Between October and November 2014, defendant withdrew $122,500 of Client No. 4's money in 4 unauthorized transactions.  (PSR ¶ 16.)

*Client No. 5*:  In 2015, defendant obtained $500,000 from Client No. 5 based on the false promise that defendant would profitably invest the money on Client No. 5's behalf.  (PSR ¶ 17.)  Defendant

6

did not invest the money and used $425,000 of it to pay his own expenses.  (Id.)

   Client No. 6:  In March 2016, defendant obtained $100,000 of Client No. 6's money in an unauthorized transaction.  (PSR ¶ 18.) When confronted, defendant promised to "take care of" the claim, but he did not.  (Id.)

   GSO:  Defendant's crimes caused catastrophic financial harm to GSO, including substantial financial losses (over $2 million paid by GSO to reimburse defendant's victims for amounts not covered by GSO's insurance policies and to pay out-of-pocket expenses for attorneys, accountants, and other professionals to address the financial havoc wreaked by defendant).  (See Katzenstein Dec. ¶ 4, Exh. D; Letters from Bernard Gudvi and Michael L. Oppenheim, attached hereto.) Defendant's crimes also devastated GSO's reputation — a reputation that Bernard Gudvi, GSO's founder, has spent over 30 years building. (See Gudvi Letter attached hereto and other victim letters filed under seal.)  In this regard, the harm that defendant has caused has been particularly acute because the business that GSO is engaged in is so heavily dependent on the trust that must exist between business managers like those at GSO and the clients whose money they safeguard.  (Id.)  That trust was completely shattered when defendant's betrayal of that trust was exposed.  As a result, GSO lost existing business and has seen sharp decreases in new business. (Id.)  And there is more:  GSO has been forced to lay off approximately one dozen employees as a result of the financial downturn at the company caused by defendant's crimes, and each of these employees and their families are now suffering from their loss of wages and benefits.  (Id.)

7

**III. CONCURRENCE IN THE FINDINGS OF THE PRESENTENCE REPORT**

The government concurs in the findings of the Presentence Report prepared by the Probation Office in this case and disclosed on March 30, 2017.

**IV. GOVERNMENT'S POSITION RE SENTENCING**

As explained in the following discussion, the government's recommendation that defendant be sentenced to 63 months in custody is based on an evaluation of the advisory sentencing guidelines and the other § 3553(a) factors.

**A.    Advisory Sentencing Guidelines**

**1.    Stipulations of the Parties**

Defendant and the government stipulated in the plea agreement that the following advisory sentencing guidelines apply:

*Count 1: Wire Fraud (18 U.S.C. § 1343)*

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1(a)(1) |
| Loss between $3.5 and $9.5 million | +18 | USSG § 2B1.1(b)(1)(J) |
| Abuse of Position of Trust | +2 | USSG § 3B1.3 |

*Count 2: Subscription to False Tax Return (26 U.S.C. § 7206(1))*

| | | |
|---|---|---|
| Base Offense Level (tax loss over $1.5 million): | 22 | USSG §§ 2T1.1; 2T4.1(I) |
| Unreported Income from Criminal Activity | +2 | USSG § 2T1.1(b)(1) |

(Plea Agreement (CR 6) ¶ 18.) The parties reserved the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate. (Id.)

The government agreed to recommend that defendant's offense level be reduced by three levels for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), (b) and does so recommend.  (<u>Id.</u> ¶ 5(c).)  The government also agreed to recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range provided that the offense level used by the Court to determine that range is 26 or higher and provided that the Court does not depart downward in offense level or criminal history category, and will so recommend.  (<u>Id.</u> ¶ 5(e).)

      2.    <u>Wire Fraud:  The 18-level Enhancement for Loss Applies Because the Loss was Greater than $3.5 Million</u>

Defendant has admitted that he embezzled and misappropriated client funds totaling approximately $7,194,000.  He also caused over $2 million in losses to GSO.  (PSR ¶¶ 20, 119; <u>see also</u> Katzenstein Dec. ¶ 4; Exh. D.)  Client account records from GSO also establish that defendant embezzled and misappropriated this amount.  Accordingly, the Probation Officer correctly applied an 18-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(J) because the loss was greater than $3.5 million but not more than $9.5 million.  (PSR ¶ 33.)

      3.    <u>Wire Fraud: The Abuse of Position of Trust Enhancement Applies Because Defendant Had Access To His Clients' Accounts By Virtue of Being Their Business Manager</u>

The Probation Office properly applied a 2-level upward adjustment because defendant's offense involved an abuse of a position of trust.  (PSR ¶¶ 35-36.)  Section 3B1.3 of the guidelines provides that "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," a 2-level upward

adjustment applies.  The commentary to this section explains that
"public or private trust" refers to a position "characterized by
professional or managerial discretion (i.e., substantial
discretionary judgment that is ordinarily given considerable
deference).  Persons holding such positions ordinarily are subject to
significantly less supervision than employees whose responsibilities
are primarily non-discretional in nature."  USSG § 3B1.3, comment.
(n.1).  For the adjustment to apply, the position of trust "must have
contributed in some significant way to facilitating the commission or
concealment of the offense (e.g., by making the detection of the
offense or the defendant's responsibility for the offense more
difficult)."  Id.

        Here, defendant was the business manager of the victim-clients
and, in that capacity, oversaw all financial aspects of their careers
and incomes, including collecting income and compensation on behalf
of the clients, maintaining and safeguarding the clients' bank and
investment accounts, providing accounts payable services on the
clients' behalf, preparing short term and long term budgets, and
managing the clients' investments.  As their business manager,
defendant had access to the clients' financial accounts, books, and
records.  That access made his offense possible.  Moreover, as the
business manager, he could – and did – create false records that
concealed the cash draws by omitting them or documenting the
purported legitimate uses of the funds that he embezzled.  (E.g.,
Exh. C.)  As such, his position enabled him to cover up the loss of
funds, thereby concealing his offense.  See United States v.
Christiansen, 958 F.2d 285, 288 (9th Cir. 1992) (upholding
enhancement for credit union manager whose position allowed her

10

access to large amounts of cash and made it possible to conceal the theft for extended period of time); <u>United States v. Hendricks</u>, 434 F. App'x. 812, 2011 WL 2749814 (11th Cir. 2011) (enhancement properly applied to business manager and accountant for nonprofit organization who stole funds from the organization; defendant enjoyed broad discretion in managing the organization's accounting and finances).

    4.   <u>Subscription to False Tax Return: Tax Loss</u>

The IRS-CI special agent's analysis of the records shows the following amounts of unreported income (based on defendant's unauthorized withdrawals from Client Accounts) for the following years:

| Client | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|--------|------|------|------|------|------|-------|
| *No. 1* | 437,500[2] | | | | | |
| *No. 2* | 614,500 | 1,106,500 | 1,621,500 | 1,346,000 | 125,000 | |
| *No. 3* | | | | | 712,500 | |
| *No. 4* | | | | | 122,500 | |
| Total | 1,052,000 | 1,106,500 | 1,621,500 | 1,346,000 | 960,000 | **6,086,000[3]** |

(<u>See</u> PSR ¶ 21.)

The IRS-CI special agent's calculation of the tax due and owing on this unreported income, using a tax rate of 28%, is:

| 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|------|------|------|------|------|-------|
| 294,500 | 309,820 | 454,020 | 376,880 | 268,800 | **1,704,080** |

---

[2] Defendant also took $571,500 in unauthorized withdrawals from Client No. 1 in 2009, resulting in the total loss of $1,009,000 sustained by Client No. 1.

[3] This total unreported income figure does not include the additional amounts embezzled/misappropriated by defendant from Client No. 5 ($425,000) and Client No. 6 ($100,000) or the $571,500 embezzled from Client No. 1 in 2009.

(See id.)  This tax loss results in a base offense level for the tax count of 22.  (PSR ¶ 39.)

### 5.  Unreported Income from Criminal Activity

As described above, defendant's unreported income included more than $10,000 from criminal activity, namely the embezzlement from GSO's clients.  Accordingly, the two-level enhancement under Sentencing Guideline § 2T1.1(b)(1) applies.  (PSR ¶ 40.)

### 6.  A 2-Level Multiple-Count Adjustment Applies

In the plea agreement, the government reserved the right to argue that an upward adjustment applies under the guidelines applicable to determining the combined offense level for both counts of conviction, USSG §§ 3D1.1-3D1.4 (the "Multiple Count Guidelines"), and defendant reserved the right to argue that no adjustment applies under the Multiple Count Guidelines.  (Plea Agreement (CR 6) ¶ 18.)

The Probation Officer correctly found that a 2-level multiple-count adjustment applies pursuant to USSG § 3D1.1-3D1.4.  (PSR ¶¶ 45-48.)  Sentencing Guideline § 3D1.1 provides that when a defendant has been convicted of more than one count, the court should: (1) group the counts into distinct groups of closely related counts ("groups") by applying USSG § 3D1.2's grouping rules; (2) determine the offense level applicable to each group by applying the rules in USSG § 3D1.3; and (3) determine the combined offense level applicable to all groups by applying USSG § 3D1.4's rules.

Here, defendant has pled guilty to a wire fraud count and a subscription to a false tax return count.  The Ninth Circuit has affirmed a sentencing court's determination that mail/wire fraud and tax counts do not group because they involve different victims and

harms.  United States v. Smith, 424 F.3d 992, 1015 (9th Cir. 2005)
(affirming district court's decision not to group tax counts with
mail and wire fraud counts because victim of the former was the
United States government whereas the victims of the latter were the
clients who had their money stolen by the defendants); United States
v. Bates, 166 F. App'x. 972, 973 (9th Cir. 2006) (unpublished)
(affirming district court's decision not to group tax-related
conspiracy count with money-laundering conspiracy counts because the
harms and victims were different).  Accordingly, a multiple count
adjustment is appropriate.  Because the offense levels for
defendant's offenses are 27 and 24, respectively, there are two units
under USSG § 3D1.4, resulting in an additional two levels for a pre-
acceptance total offense level of 29.

It is true that the grouping guidelines provide that "[a]ll
counts involving substantially the same harm shall be grouped
together into a single Group."  USSG § 3D1.2.  Further, "[c]ounts
involve substantially the same harm within the meaning of this rule
. . . [w]hen one of the counts embodies conduct that is treated as a
specific offense characteristic in, or other adjustment to, the
guideline applicable to another of the counts."  USSG § 3D1.2(c).
Here, the embezzlement charged in count one embodies conduct that is
treated as a specific offense characteristic of the tax offense
charged in count two; i.e., it is the basis for the enhancement under
USSG § 2T1.1(b)(1) pursuant to which two levels are added because
more than $10,000 of the unreported income for one year came from
criminal activity.  Nonetheless, as explained below, grouping on this
basis should be rejected.

13

Eight appellate courts have explicitly rejected grouping based on USSG § 3D1.2(c). For example, in <u>United States v. Vucko</u>, 473 F.3d 773 (7th Cir. 2007), Susan Vucko embezzled more than $700,000 from her employer and failed to report the embezzled amount as income; she pleaded guilty to wire fraud in violation of 18 U.S.C. § 1343 and filing a false tax return in violation of 26 U.S.C. § 7206(1). The district court imposed concurrent sentences of two years' imprisonment for each offense, and Vucko appealed, arguing that the district court erred by failing to group the charges under USSG § 3D1.2(c). The Seventh Circuit affirmed. First, the court held that the "'specific offense characteristic' in the tax guideline is too broad to require the conclusion that it encompasses wire fraud in particular." The Court explained:

> Wire fraud is just one of countless ways to obtain income from criminal activity. To suggest that any criminal offense that produces income is subsumed into the tax guideline calculation with a two-level enhancement is to create a category without limits. This is different from possessing a gun during a bank offense, where precisely that conduct is identified as a specific offense characteristic, or obstruction of justice, which is a specific adjustment under § 3C1.1. There is a distinction between saying that any underlying criminal act increases the offense level and that a specific underlying act increases the offense level. Furthermore, the Commentary indicates that the enhancement is not supposed to account for the underlying crime, but rather the presumption that officials will not be able to calculate the full extent of the ill-gotten gains that a defendant failed to report.[4]

---

[4] Application Note 3 defines the term "criminal activity" in § 2T1.1 to mean "any conduct constituting a criminal offense under federal, state, local, or foreign law." The Background Note explains further that "[f]ailure to report criminally derived income is included as a factor for deterrence purposes. Criminally derived income is generally difficult to establish, so that the tax loss in such cases will tend to be substantially understated. An enhancement for offenders who violate the tax laws as part of a pattern of criminal activity from which they derive a substantial portion of their income also serves to implement the mandate of 28 U.S.C.

1   . . . .  The purpose of the enhancement suggests that it
2   does not and was not intended to add additional punishment
    to take the wire fraud into account, but rather that it was
3   intended to recognize that [the defendant] may have
    underreported more income than the IRS detected.

4   <u>Vucko</u>, 473 F.3d at 779.

5        Second, the Seventh Circuit held that the tax and fraud counts

6   did not group under USSG § 3D1.2(c) because the offenses were not

7   "closely related" as required by the commentary to that guideline.

8   USSG § 3D1.2, comment. (n.5) ("Of course, this rule applies only if

9   the offenses are closely related.").  The <u>Vucko</u> Court noted that the

10  fraud offense and tax offense "were two different crimes, causing two

11  different harms and harming two different victims [Vucko's employer

12  from whom the funds were embezzled, and the United States government

13  to whom false statements were made resulting in unpaid income

14  taxes]." <u>Vucko</u>, 473 F.3d at 779.

15       Finally, the <u>Vucko</u> Court explained that grouping the fraud and

16  tax counts "would seriously undercut the concept of 'incremental

17  punishment' that underlies both the grouping rules and the Guidelines

18  as a whole.  The effect of grouping Vucko's offenses would be to

19  eliminate the marginal punishment for her second offense . . . .

20  There would be no increase at all for her additional crime . . . ."

21  <u>Id.</u>

22

23

24

25

26  § 994(i)(2) ["The [Sentencing] Commission shall assure that the
    guidelines specify a sentence to a substantial term of imprisonment
27  for categories of defendants in which the defendant committed the
    offense as part of a pattern of criminal conduct from which the
28  defendant derived a substantial portion of the defendant's income"]."

For similar reasons, the First,[5] Second,[6] Third,[7] Fourth,[8] Sixth,[9] Tenth,[10] and Eleventh[11] Circuits have also all rejected the argument that USSG § 3D1.2(c) requires grouping of tax and non-tax offenses.[12]

---

[5] United States v. Martin, 363 F.3d 25, 41 (1st Cir. 2004) (vacating sentence and remanding based on district court's incorrect grouping of fraud and tax counts under USSG § 3D1.1(c)).

[6] United States v. Gordon, 291 F.3d 181, 191-93 (2d Cir. 2002) (holding that grouping of fraud and tax counts under USSG § 3D1.2(c) was error, but holding that the counts did group under § 3D1.2(d)).

[7] United States v. Vitale, 159 F.3d 810, 815 (3d Cir. 1998); United States v. Astorri, 923 F.2d 1052, 1056-57 (3d Cir. 1991) ("Thus, the Commission included this specific offense characteristic to deter tax evasion.  To include this specific offense characteristic as 'conduct' in the fraud count negates its separate inclusion within the tax evasion guideline.").

[8] United States v. Morris, 229 F.3d 1145, 2000 WL 1260162 (4th Cir. 2000) (unpublished) (rejecting grouping of tax evasion and money laundering offenses; "The victims, harms, and conduct for the offenses of conviction were different.  As a result, the offenses were not closely related and the grouping rule found in USSG § 3D1.2(c) did not apply.").

[9] Weinberger v. United States, 268 F.3d 346, 352-55 (6th Cir. 2001) (rejecting grouping under USSG § 3D1.2(c) because the harms were not closely related).

[10] United States v. Peterson, 312 F.3d 1300, 1302-04 (10th Cir. 2002) ("[T]ax evasion and mail fraud are not the same, the offenses involve distinct behaviors, the purposes of the enhancements are different, and the harms attributable to each crime are dissimilar. Accordingly, the district court correctly declined to group the tax evasion and mail fraud counts in this case.").

[11] United States v. Doxie, 813 F.3d 1340, 1345-48 (11th Cir. 2016).

[12] In one unpublished memorandum decision, the Ninth Circuit upheld grouping of tax and wire fraud convictions on the ground that one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts, citing USSG § 3D1.2(c).  United States v. Narum, 577 F. App'x. 689, 691 (9th Cir. 2014) (unpublished).  In Narum, grouping would have increased the sentence: Narum had pled guilty to the tax counts but went to trial on the fraud counts, and the government argued and the court found that, because the offenses grouped and defendant had not pled guilty to all of the offenses in the group, he was not entitled to an adjustment for acceptance of responsibility.

The Fifth Circuit has also grouped mail fraud and tax evasion offenses based on USSG § 3D1.2(c), but it relied solely on the text

16

For all the reasons set forth in <u>Vucko</u> and the other cases cited above, the offenses of conviction in the instant case should not be grouped under USSG § 3D1.2(c).  Defendant committed two different crimes: embezzlement and filing a false tax return.  Defendant caused two different harms: stealing from his clients and failing to report income to the IRS.  Defendant harmed two different victims (his clients and GSO on the one hand, and the government (IRS) on the other hand), in two different amounts ($8,657,268 and $1,704,080). <u>See</u> USSG § 3D1.2 Background ("A primary consideration is whether the offenses involve different victims.").  The necessary connection is lacking between defendant's thefts from his clients and his cheating the government by failing to report his ill-gotten income, and thus the offenses are not closely related as is required for grouping under USSG § 3D1.2(c).

Nor should the counts of conviction be grouped under USSG § 3D1.2(d).  Guideline § 3D1.2(d) provides for grouping of offenses "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved or some other measure of aggregate harm."  In <u>United States v. Martin</u>, 363 F.3d 25, 44 (1st Cir. 2004), the First Circuit rejected this basis for grouping fraud offenses and tax offenses even though the guidelines "require incremental enhancement based on the amount of loss."  The First Circuit explained that "[i]n addition to requiring that the counts be based on the amount of harm or loss, grouping under 3D1.2(d) also requires that the offenses be of 'the same general type.'"  <u>Id.</u> (<u>citing</u> USSG § 3D1.2 comment. (n.6)).  The

of the specific provision and did not consider the commentary at all. <u>United States v. Haltom</u>, 113 F.3d 43, 45-46 (5th Cir. 1997).

Martin Court, which had also rejected grouping under USSG § 3D1.2(c), held that, for similar reasons, the fraud and tax offenses were "not offenses of the same general type within the meaning of USSG § 3D1.2 comment. (n.6). . . . [The offenses] cause different harms to different victims and require different conduct on the part of the defendant." Id. As an additional reason, the Martin Court noted that, "while the tables that set the offense levels both increase with the amount of loss, they increase at different increments for tax and fraud offenses. The different increments reflect the different nature of the crimes, basing the offense level for the fraud counts on the amount of loss to the victim and the offense level for the tax evasion counts on the tax loss to the government." Id.

The Third,[13] Sixth,[14] Seventh,[15] Eighth,[16] Tenth,[17] and Eleventh[18] Circuits all agree with this reasoning.[19]

       7.   Summary

For the reasons set forth above, the government submits that the applicable advisory guidelines in this case are:

    7       (base offense level)

  + 18      (loss between $3.5 million and $9.5 million)

---

[13] United States v. Seligsohn, 981 F.2d 1418, 1425-26 (3d Cir. 1992).

[14] Weinberger, 268 F.3d at 354-55.

[15] Vucko, 473 F.3d at 779-80.

[16] United States v. Shevi, 345 F.3d 675, 681 (8th Cir. 2003).

[17] United States v. Lindsay, 184 F.3d 1138, 1142-43 (10th Cir. 1999).

[18] Doxie, 813 F.3d at 1345-48.

[19] But see United States v. Gordon, 291 F.3d 181 (2d Cir. 2002) (discussed in footnote 7, above).

1  + 2      (abuse of position of trust)

2  + 2      (multiple-count adjustment)

3  - 3      (acceptance of responsibility)

4    These guidelines result in a total offense level of 26 and an

5  advisory sentencing guidelines range, based on Criminal History

6  Category I, of 63 to 78 months.

7    **B.    Analysis of the § 3553(a) Factors**

8    The factors to be considered when imposing sentence, as set

9  forth in 18 U.S.C. § 3553(a), include:

10
11    (1) The nature and circumstances of the offense and the
     history and characteristics of the defendant;

12    (2) The need for the sentence imposed –

13       (A) to reflect the seriousness of the offense, to
     promote respect for the law, and to provide just punishment
14     for the offense;

15       (B) to afford adequate deterrence to criminal conduct;
     [and]
16
17       (C) to protect the public from further crimes of the
     defendant . . .

18    (3) The kinds of sentences available;

19    (4) [the applicable sentencing guidelines];

20    (5) [the applicable sentencing guidelines policy
     statement];
21
22    (6)  The need to avoid unwarranted sentence disparities
     among defendants who have been found guilty of similar
23     conduct; and

24    (7) The need to provide restitution to the victims of the
     offense.

25  18 U.S.C. § 3553(a).

26    Factor 4 (the applicable sentencing guidelines) was discussed

27  above.  The remaining § 3553(a) factors are discussed below.

28

1              1.   Nature and Circumstances of the Offense

2         Defendant's offense conduct lasted for seven years and resulted

3    in over $8.6 million in losses suffered by the victim-clients and the

4    business management firm of which he was a partner.  The amount of

5    financial loss, however, does not capture the full extent of the harm

6    that defendant has caused.  GSO's business is heavily dependent on

7    the trust that must exist between business managers like those at GSO

8    and the clients whose money they look after.  That trust was

9    destroyed when defendant's betrayal of that trust was exposed.  As a

10   result of this blow to GSO's reputation, which GSO's founder Bernard

11   Gudvi spent thirty years building, GSO lost existing business and

12   future business.  GSO has had to lay off about a dozen employees, and

13   each of these out-of-work employees and their families are now

14   suffering from their loss of wages and benefits.

15        Defendant perpetrated his crimes by abusing the trust of his

16   clients and his business partners.  In order to conceal his offenses

17   from his clients and his colleagues at GSO, defendant falsified the

18   very accounting records that were supposed to protect them.  (E.g.,

19   Exh. C.)  In furtherance of his crimes of conviction, defendant also

20   committed other uncharged crimes including using other persons'

21   identifying information without their authorization (as when he

22   forged their signatures) and making false representations to City

23   National Bank (as when he obtained cash from clients' accounts under

24   false pretenses).[20]

25   _____

26        [20] Defendant's conduct constitutes bank fraud even though the
     ultimate loss was borne by the clients, not by the bank.  See United
27   States v. McNeil, 320 F.3d 1034 (9th Cir. 2003) (affirming a § 1344
     conviction, holding that liability for federal bank fraud should not
28   turn on issues of state commercial law regarding which parties to a

1  Defendant's offense conduct only stopped after one of his

2  victims discovered that money was missing from her account.  Even

3  after he was caught, defendant persisted in lying and blaming others

4  in an effort to hide his crimes.  When one victim asked about her

5  apparent lack of funds, defendant told her it was because she spent

6  too much on jewelry and family expenses.  (See Katzensein Dec. ¶ 6.)

7  According to the Complaint filed by this victim-client, after the

8  victim-client's new business manager confronted defendant about the

9  missing funds, defendant falsely told the victim-client's new

10 business manager that the large cash transfers were "not a problem,"

11 that the victim-client had signed a letter "acknowledging" each and

12 every one of these withdrawals, and that defendant had "signed

13 receipts" in "storage" for "at least seventy percent of them."[21]

14 Defendant also concealed his likely termination at GSO from the Banc

15 of California ("BoC"), which enabled him to obtain a $250,000 loan

16 from BoC on which he promptly defaulted.[22]

17   These are all aggravating factors.

---

transaction ultimately bear the loss, and noting that "the scheme to
deceive the bank was essential to [the defendant's] overall plan").

[21] [Client] v. GSO Business Management, LLC & Jonathan Schwartz,
Complaint for Breach of Fiduciary Duty, Conversion, Fraud and
Negligence, Case No. BC620393 (California Superior Court, Los
Angeles); see also PSR ¶ 14.

[22] Defendant obtained a $250,000 loan from Banc of California
("BoC") on August 21, 2015 (Loan No. 30171).  The funds were
disbursed to defendant and accounts controlled by defendant on August
24, 2015.  Repayment of the loan was due on February 5, 2016.  On
April 25, 2016 – after being confronted by Client No. 2's new
business manager about the missing funds – defendant obtained a new
loan (Loan No. 30186) from BoC to pay off the first loan.  In order
to obtain this new loan, defendant maintained the pretense that he
remained in good standing with GSO.  The terms of the new loan
required installment payments for $7,000 principal and interest on
May 5, 2016 and June 5, 2016, and a final principal and interest
payment of $236,873 on July 5, 2016.  Defendant made none of these
payments.  (See Katzenstein Dec. ¶ 5; Exh. E.)

1    2.    <u>History and Characteristics of Defendant</u>

2        Defendant is a 46-year-old United States citizen.  (PSR ¶ 64.)

3  He is well-educated and, since graduating from college, has worked in

4  high-paying jobs in the financial services industry.  (PSR ¶¶ 85-87,

5  89-91.)  By in or about April 2013, he was earning over $100,000 a

6  month.  In 2010, he started Heartview Global Foundation, a charity

7  that helps pay for coronary CT angiograms.  (PSR ¶ 92.)  As defendant

8  himself has said, he "ha[d] it all."[23]

9            a.    *Acceptance of Responsibility*

10       Shortly after the government met with counsel for GSO as part of

11 its investigation, defendant's counsel informed the government that

12 defendant would admit his offense conduct and wanted to resolve his

13 case.  Defendant signed a plea agreement and entered his guilty pleas

14 as contemplated by the agreement.  This conduct reflects defendant's

15 acceptance of responsibility and is a mitigating factor.[24]  It should

16 be noted, however, that defendant admitted his conduct only after the

17 government was already aware of it and in possession of sufficient

18 evidence to establish defendant's guilt.

---

23 Guest Column by defendant, published in <u>The Hollywood Reporter</u>
on April 11, 2017, available at
https://www.yahoo.com/music/hollywood-business-manager-stole-alanis-
morissette-other-clients-134208091.html

24 Although defendant's plea agreement did not include
cooperation provisions, defendant requested the opportunity to
provide information to the government that might be a basis for a
downward departure under USSG § 5K1.1.  The government met with
defendant for this purpose on two occasions.  The information
defendant provided was not useful within the meaning of the
guidelines.

                            **b.**   *The Court should reject any request by defendant for a variance based on his purported gambling and drug addictions*

On April 11, 2017, defendant published a "Guest Column" in the Hollywood Reporter in which he stated that he committed his crimes because he has been a "gambling addict" since college. Defendant also told the Probation Officer that he became "addicted" to gambling in college and, after stopping during his sophomore year, began gambling again in 2009. (PSR ¶ 78.) Defendant presumably will request a downward variance based on his supposed gambling addiction.

To date, defendant has provided <u>no</u> evidence that he suffers from a gambling <u>addiction</u> other than the fact that he gambles. There is no evidence that defendant's gambling was pathological, compulsive, or beyond his control in a way that mitigates his guilt for stealing the money he wagered. The Probation Officer noted that defendant "has not provided documentation of his psychiatric conditions other than letters confirming his treatment." (PSR ¶ 80.)

Indeed, defendant's own description of what happened proves that he was not operating under a gambling addiction:

> At first, I "borrowed" a little from clients, with the hopes that I would pay them back if I won that night's bet. That snowballed, and as I kept losing, I kept stealing. I kept telling myself that I just needed one lucky break, and I'll pay them back. That lucky break never came . . . .

(Guest Column (<u>see</u> n.23 above).) By his own account, defendant committed his offense in the same way many Ponzi-schemers and other fraud defendants do – "borrowing" or investing a little money obtained from clients or business partners to take advantage of a business "opportunity," and then getting in deeper and deeper when the "opportunity" doesn't pan out and the money can't immediately be repaid.

Moreover, it is clear that defendant was sufficiently able to control his desire to gamble such that he did not compromise his ability to live in a 5-bedroom, 5-bath, 4661-square foot home in Agoura Hills valued at $1.9 million (PSR ¶¶ 93, 97); maintain over $121,000 in a 401(k) account (PSR ¶ 93); lend $53,000 to two associates (id.); and take vacations to resort locations such as Bora Bora and the Cayman Islands (PSR ¶ 19). Cf. United States v. Dikiara, 50 F. Supp. 3d 1029, 1032 (E.D. Wis. 2014) (finding a gambling addiction where "[v]irtually all of the [embezzled] money went to the casino" and Dikiara's gambling caused her to lose "not just the proceeds of the crime but also [Dikiara] and her husband's savings").

In sum, defendant chose to spend some of the proceeds of his embezzlement on gambling. He is no different than other defendants who spend the proceeds of their crimes according to their own pleasure, choosing for instance to buy high-end real estate, fancy cars or luxury consumer goods. There is simply no evidence that defendant's gambling was anything other than a choice; there is no evidence that defendant suffered from such a compulsion to gamble that his stealing to pay for his gambling activities should be excused.

Defendant blames his gambling addiction for his crimes, but this is nothing more than posturing for sentencing. During the seven years that defendant embezzled money, he never sought professional help nor even asked his colleagues, friends, or family for help with his supposed "addiction." When his thefts came to light, he did not explain that they were beyond his control because he was addicted to gambling. To the contrary, he lied, cast blame on others, and tried

to hide his crimes.   When and if defendant seeks a variance based on his purported gambling addiction, it should be denied.

### 3.   Goals of Sentencing

Given defendant's acceptance of responsibility and the publicity surrounding his case, he is unlikely to reoffend and therefore the need to protect the public from further crimes by defendant himself is low.   However, that is just one of the goals of sentencing set out in § 3553(a)(2).   That section also requires this Court to fashion a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and affords adequate general deterrence to criminal conduct.

These additional goals of sentencing support a significant term of incarceration in this case.   Defendant's offense was serious, resulting in substantial financial harm to his victims and serious collateral consequences to the GSO firm and its employees.   The need for general deterrence is also pronounced in order to discourage unscrupulous employees in business management positions from taking advantage of their clients, who rely on the honesty of the financial managers they hire.

The importance of these goals of sentencing, and the need for a significant term of incarceration to serve these goals, is especially pronounced in this case, as the letter from Bernard Gudvi, the founding partner of GSO, makes clear.   Mr. Gudvi writes:

> The impact of the defendant's betrayal has been felt beyond my firm. . . . [T]rust is the bedrock of our industry.   A business manager is given tremendous power and responsibility over his or her client's assets.   It is only through the reinforcement of that trust, day in and day out, that we are able to serve our clients' best interests. When reports surface that there has been a breach in this trust, it doesn't just hurt the person responsible, or even that person's firm.   I have spoken with numerous colleagues

25

1  in the business management industry, and the message has
2  been clear: The defendant's actions hurt all of us. The
   critical bonds of trust that we require to do our jobs have
3  been strained; clients now have reason to second-guess our
   motives even in the absence of evidence that should cause
4  them concern; and the entire industry I serve in has been
   tainted by the defendant's actions.

5  (Gudvi letter; _see also_ victim letters filed under seal.)

6      **C.    Government's Sentencing Recommendation**

7      As explained above, the government maintains that defendant's

8  properly calculated post-acceptance advisory guideline offense level

9  is 26. The government respectfully submits that a sentence at the

10 low end of the applicable advisory sentencing guidelines range,

11 namely 63 months, appropriately balances the mitigating and

12 aggravating factors in this case.

13 ///

14 ///

15 ///

16

17

18

19

20

21

22

23

24

25

26

27

28

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court:

• Find that defendant's post-acceptance advisory sentencing guidelines offense level is 26;

• Sentence defendant to 63 months in custody, the low end of the resulting advisory sentencing guidelines range, to be followed by three years of supervised release; and

• Order restitution in the total amount of $8,657,268, due in the amounts and to the parties set forth in paragraph 119 of the PSR.

Dated: April 19, 2017                    Respectfully submitted,

                                         SANDRA R. BROWN
                                         Acting United States Attorney


                                              /s/ *Ranee A. Katzenstein*
                                         RANEE A. KATZENSTEIN
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA