# GUDVI LETTER



Bernard H. Gudvi
Michael L. Oppenheim
Nicholas Brown

**BUSINESS MANAGEMENT, LLC**

15260 Ventura Blvd., Suite 2100
Sherman Oaks, CA 91403
818.990.0550
FAX 818.990.5707
www.gsogroup.com

Honorable Dolly M. Gee
United States District Judge
United States Courthouse
350 West 1st Street
Courtroom 8C, 8th Floor
Los Angeles, California  90012

Re:  <u>United States v. Jonathan Todd Schwartz, CR 17-22-DMG</u>

Dear Your Honor,

    My name is Bernard Gudvi, and I am the founding partner of GSO Business Management, LLC ("GSO"), a large, and until recently, very successful company based in Southern California that specializes in providing business management services to members of the entertainment industry, to high net worth individuals, and some corporate clients. The defendant who is set to appear before you for sentencing in this case, Jonathan Schwartz, is a former partner at GSO, and he is being sentenced for defrauding GSO and GSO's clients by betraying the trust that my firm and its clients placed in him and brazenly stealing close to $7 million in cash from at least six GSO clients. I am writing to your Honor in order to provide the Court with a sense of the depth of the defendant's betrayal and so this Court can consider the incalculable damage that the defendant has inflicted through his selfish fraud and thievery on my business, on my firm's clients, on his former colleagues, and on the industry in which I practice. I hope you will give significant weight in your sentencing decision to the devastation that the defendant's actions have caused to those, like me, who trusted him and who have had decades of hard work undermined by his crimes, and I share the sentiment of all of my colleagues at GSO and his other victims by asking this Court to sentence the defendant to the maximum term of imprisonment available for his crimes.

    I must start, however, by expressing how truly sad I find this whole situation. I write to the Court with a truly heavy heart. It is difficult for me to think back over the decades that I've known the defendant and imagine, at any point, that I would be in this position before your Honor, commenting as a victim of his crimes. The sadness of this moment will weigh on me for a very long time.

    As this Court knows, last November the defendant signed a plea agreement in which he admitted that he stole approximately $7 million from clients of my firm. Unfortunately, your Honor, as well as the public, are now very much aware of the details of the defendant's crimes, as so much of what he did has played out in the press, to the detriment of my firm, given the fact that the victims of the defendant's crimes include some of GSO's celebrity clients. What I hope to help the Court to understand is another side to this story that has been largely absent from the news headlines surrounding this case. That is the story of how gravely the defendant's crimes have harmed my business and a reputation that I have spent four decades building in an industry based largely on trust, in addition to the damage he has inflicted on my firm's clients, his former co-workers, and the industry

49

307393.1

in which GSO operates.

I am a child of Holocaust survivors who was born in a Displaced Persons camp in Germany. I came to the United States when I was ten years old, served for four years in the United States Air Force after high school, and graduated from college after I returned from a tour of duty in Vietnam. Ever since I was in high school, I dreamed of being a business manager, and I worked extremely hard, coming from a family with no means, to get to where I am today. In the late 1970s, I founded my own business management firm, which eventually became GSO, and I have worked tirelessly ever since to make that business a success and to gain the trust and admiration of clients, colleagues, and competitors working in the field of business management.

The defendant's actions have inflicted harm on this business that I spent a lifetime building in a number of different ways, and I hope that this Court considers all of them in determining the appropriate sentence he should face. There is, most obviously, the financial harm he has caused to GSO, and it has been significant. GSO, like the GSO clients who the defendant stole from, was completely blindsided by the defendant's embezzlements given the careful effort he made to conceal his wrongdoing from his partners at the firm and the lies he told to mask his misbehavior. Nevertheless, to date, GSO and its insurers have borne the full financial fallout caused by the defendant's criminal conduct. GSO and its insurers were obligated to repay all of the money the defendant stole from GSO's clients; GSO has spent in excess of one million dollars in out-of-pocket costs to hire accountants, lawyers, and other professionals to identify and try to remedy the harm the defendant caused; GSO has lost millions of dollars in business and has been hampered in its ability to attract new clients because of the pall that the defendant's actions have cast over the firm; and GSO has sustained a blight on a sterling reputation that I worked tirelessly for decades to build that it will likely never shed. In terms of dollars, it is safe to say the defendant's crimes will ultimately cost GSO no less than $20 million.

In addition to these sizeable financial losses that the defendant's criminal conduct has inflicted on my firm, there is a deeper, more tragic loss caused by his actions that has penetrated my firm, spread to my firm's clients, and inflicted significant damage on the larger world of the industry that I have been a part of for four decades. It is a loss of trust, a loss of faith in the bonds that those in my firm and in my industry depend upon for success. It is the loss that comes from being betrayed by someone close, someone who you trusted as a business partner, as well as a friend. To explain this type of loss and the sting of the defendant's betrayal, I would like to describe the defendant's background at GSO, the incredible trust that we placed in him as a partner at the firm, and how he ultimately violated that trust, as we now know he did for years in a particularly cold and calculating manner, with little apparent care as to who he was hurting.

The defendant did not come to GSO as a stranger. My business partner of 23 years, Michael Oppenheim, has known him since he was a child. They both grew up on the East Coast and knew each other through family friendships. Approximately 17 years ago, Michael received a call from friend who was related to the defendant and who at the time employed the defendant at a different business management firm. That firm was changing its direction, and Michael and I were presented with the opportunity to hire the defendant.

We did, of course, hire the defendant, and he came to us as a kind of friend of the family. He represented the youth in our business, and we all believed, he had a very bright future, not only at our firm but in the industry in general. I personally took considerable interest in his success, as I saw some of myself in him. He appeared to be young and hungry, as well as eager to advance and succeed, and I

50

307393.1

began to mentor him in the ways of the business. We regularly huddled outside of work, over a drink or a coffee, where I would provide him with my counsel. I wanted to see him succeed and thought I was helping him to do so. A few years after Michael and I hired the defendant at GSO, we made him our partner. He told us that, aside for the birth of his children, it was the happiest day of his life.

As is now painfully clear, the defendant repaid the trust we placed in him by making him our partner by completely betraying that trust over several years in ways we could not have imagined. As a partner at the firm, the defendant was given the power of attorney over the finances of GSO's clients. Shortly after making partner, he took advantage of the absolute trust that the partners at GSO placed in one another, and he began repeatedly abusing this privilege by stealing from the firm's clients.

Notably, to my knowledge, at no point in time when these thefts were occurring did the defendant ever indicate to anyone in our firm that he was struggling with a drug or gambling addiction or any other addiction for that matter. If he had given us a clue that he was actually facing such problems, he would have found few more willing and able to help him than the members of our firm. Our firm is a tight-knit family, and we support each other however we can. There is open and regular communication between all of us, and we had weekly partner meetings, quarterly firm meetings, and regular company outings and retreats to foster support and connections. Yet, through all of this, not once did the defendant come to me or anyone else to discuss his alleged struggles.

While none of the defendant's business partners saw any hint whatsoever that the defendant was suffering from any sort of addiction, we began to see signs during the defendant's final years at the firm suggesting that he was not the trustworthy person he portrayed himself to be and that he thought nothing of taking advantage of his friends. For instance, before the revelations surfaced that he had stolen millions of dollars from GSO's clients, we became aware that the defendant was having trouble with the IRS and needed help. The defendant had arranged a settlement with the IRS to pay his back taxes. He defaulted on that settlement. Because of his status in our firm, the federal government looked to us as partly responsible for the defendant's breach of his settlement agreement with the IRS. If the defendant, one of the partners at our firm, couldn't be trusted to honor his word, the IRS reasoned that the firm was potentially not trustworthy enough for the IRS to allow us to file taxes for our clients electronically. This was a dire situation considering the number of clients we have at GSO and the nature of their tax filings. The defendant asked us to help, telling us he needed an immediate loan of $400,000 to pay the IRS. Trusting and believing in the defendant, oblivious to the fact he had already been stealing from the firm's clients for years, and confident that he could reimburse the firm for any loan made to him given the salary we were paying him and the fact his business appeared to be thriving, the firm, at his fellow partners' direction, used a line of credit the firm had with a bank to provide the defendant with the money he claimed he needed to settle matters with the IRS. That money, provided to the defendant in early 2016, has never been repaid.

About two months later, we were confronted by a GSO client who was accusing the defendant of stealing millions from her. Even then, as the walls were closing in on the scheme to steal client funds that the defendant was working behind his partners' backs, he was unable to turn away from his lies. Rather, the worse things became, the more easily he seemed to dispense with the truth.

When confronted directly about the accusations of his misdeeds made by the GSO client who first unearthed his wrongdoing, the defendant made a series of wild accusations about this client, accusing her of being in the throes of drug addiction and of being mentally unstable. The defendant literally looked me in the eyes, and he told me: "I would never do anything to hurt you. I would never steal from you." Until the end, the defendant lied -- even when confronted with the truth, even when

51

given the opportunity to come clean about his actions, even when he had the opportunity to confess to the alleged addictions purportedly driving him to do so much wrongdoing. He never acknowledged the truth of what he did to me and the firm I founded or expressed regret for the damage that he did to his business colleagues. Instead, he took a lie detector examination at the firm's insistence and failed it miserably.

As explained above, the damage the defendant's crimes has inflicted goes well beyond simply the loss of money, as tremendous as those losses have proven to be. The consequences of his crimes have had a ripple effect, damaging the lives of all those in their wake. Because of the financial damage the defendant has cause our firm, we have had to terminate about a dozen staff members as our business has plummeted. We have survived so far because of the decades of trust each of the partners has built up with the firm's clients—and these relationships have been strained to the absolute limit. Our business is all about trust, and because of the defendant's actions, our firm now languishes under a cloud of suspicion that he is responsible for depositing there.

This ordeal has also taken a personal, emotional, and even physical toll on me. I just turned 70 and was looking forward to winding down my involvement in the firm after four decades of working extremely hard to make GSO a success. Indeed, before this incident, I was working at home two days a week and trying to come into the office on a less frequent basis. Now I've been forced to put all of that on hold as I have been forced to work harder than ever to repair my firm's shattered reputation and to undo all of the harm the defendant has done. I can't describe the degree of stress this has put on me at a time when I should be enjoying the fruits of my many years of labor.

This brings me to one final point I'd like to bring to the Court's attention as it considers the defendant's sentence: The impact of the defendant's betrayal has been felt beyond my firm. As I've noted throughout this letter, trust is the bedrock of our industry. A business manager is given tremendous power and responsibility over his or her client's assets. It is only through the reinforcement of that trust, day in and day out, that we are able to serve our clients' best interests. When reports surface that there has been a breach in this trust, it doesn't just hurt the person responsible, or even that person's firm. I have spoken with numerous colleagues in the business management industry, and the message has been clear: The defendant's actions hurt all of us. The critical bonds of trust that we require to do our jobs have been strained; clients now have reason to second-guess our motives even in the absence of evidence that should cause them concern; and the entire industry I serve in has been tainted by the defendant's actions.

I understand the gravity of what is being asked of your Honor by requesting that this Court impose the maximum sentence available in this case. I do so only after careful and deliberate consideration. For me, your Honor, it comes down to the following three points:

First, the defendant's actions were not done in the heat of the moment and were not aberrant transgressions. He committed his crimes over and over, engaging in, by my count, at least 151 unauthorized cash withdraws over a span of seven years in which he stole approximately $6.9 million from clients whose money he was entrusted to safeguard. From where any reasonable person would sit, it would appear unjust if a person who spent seven years stealing $7 million should expect to serve a prison sentence of less than seven years.

Second, as I can attest to first hand, the defendant had innumerable opportunities to do the right thing in this case. He never did. The door was always open for him to come in and make right what he had done, yet even when faced with the very crimes he would later admit to committing, the defendant

52

307393.1

GSO BUSINESS MANAGEMENT, LLC

looked into the eyes of those he was hurting the most, those who had placed their complete trust in him, and he lied to them. It was only when the defendant faced the certainty of being prosecuted that he finally decided that coming clean about what he had done would be in his best interests – and even now his purported contrition for what he has done is loaded with caveats and excuses that attempt to deflect responsibility for his wrongdoing away from him.

In this regard, just today I read an "open letter" that the defendant or his attorney arranged to have published in Hollywood Reporter in which he blames the crimes he committed over the past seven years on his gambling addiction, his drug and alcohol use, his "super stressful" job, and even a father who abandoned him when he was a young boy. The defendant's act of blaming his crimes on his purported addictions is the opposite of accepting responsible for the choices he made, and, in fact, minimizes the fact that the defendant made repeated decisions over the course of many years to steal and to violate the trust that was placed in him by his clients and business partners. The most notable addiction that the defendant suffers from, in my opinion, is not his purported gambling addiction, but an addiction to lying. He lied for years to his clients, his partners, and his co-workers; he lied even when directly confronted with evidence of his wrongdoing; and, to this date, he has failed to provide those he harmed with an honest apology. I urge this Court not to join the long list of those who have already been betrayed by the defendant's dishonesty by giving much weight to the belated and self-serving apologies he is now offering in the aftermath of his years of lying, cheating, and stealing.

Lastly, the defendant not only caused incalculable damage to my firm, to the client's he victimized, and to the industry whose image he has now shamefully tarnished; he caused this damage to those who trusted him the most. The defendant's abuse of the trust that he was given -- most particularly by his partners and his clients -- is an aggravating factor that I strongly urge this Court to consider when imposing the proper sentence in this case. As I explain on GSO's firm website, "What drives our relationships are the basic tenets or trust and confidence. This is what we strive for and this is what we work to maintain." The defendant's criminal conduct has destroyed this fundamental pillar upon which my life's work rests.

In asking your Honor to impose the maximum sentence available for the defendant's crimes, I do not seek retribution. I will take no personal pleasure in seeing him spend years in federal prison. My interest is in seeing a future person in the defendant's shoes, faced with similar temptations as the ones that allegedly caused the defendant's 7-year crime spree, deterred. In the process, individuals, families, companies and an industry that depends on trust as its most important currency will be blissfully unaware of how another Jonathan Schwartz never came to be thanks to the sentence imposed by this Court.

I thank your Honor for taking the time it took to read through this lengthy letter, and I appreciate your careful consideration in the matter.

Respectfully submitted,

Bernard Gudvi
Founder and Partner -- GSO Business Management

53

307393.1

GSO BUSINESS MANAGEMENT LLC