MORGAN, LEWIS & BOCKIUS LLP
Nathan J. Hochman (SBN 139137)
The Water Garden, Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA 90404
Tel:   +1.310.907.1000
Fax:   +1.310.907.2000
e-mail  nathan.hochman@morganlewis.com

Attorneys for Defendant
JONATHAN SCHWARTZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>       v.<br><br>JONATHAN TODD SCHWARTZ,<br><br>              Defendant. | No. CR 17-22-DMG<br><br>DEFENDANT'S POSITION RE: SENTENCING; DECLARATION OF NATHAN J. HOCHMAN; EXHIBITS<br><br>Date:       May 3, 2017<br>Time:       3:00 p.m.<br>Courtroom:  8C |

1    Defendant Jonathan T. Schwartz, by and through his counsel of record,

2    hereby respectfully submits his sentencing position in this matter.

3    This sentencing position is based on the files and records of the case, the

4    attached Memorandum of Points and Authorities and exhibits, and any such

5    argument as may be heard by the Court.

6    DATED:  April 26, 2017

7

8                                                         Morgan, Lewis & Bockius LLP

9

10                                            By:_____/s/ Nathan J. Hochman_____

11                                                            Nathan J. Hochman
                                                             Attorney for Defendant
12                                                         Jonathan Todd Schwartz

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

# TABLE OF CONTENTS

Page

DEFENDANT'S SENTENCING POSITION ................................................................ 1

I.      INTRODUCTION ........................................................................................... 1

II.     ANALYSIS OF SENTENCING FACTORS ................................................... 4

     A.    History and Characteristics of the Defendant (§ 3553(a)(1)) ........... 7

        1.    Personal Background .................................................................. 8

           a.    Growing Up with an Abusive Mother and a Gambling and Drug-Addicted Father .............................. 8

           b.    College Years: Beginnings of Accounting Career and Gambling Addiction .................................. 9

           c.    Building a Successful Career and Starting a Family ....... 9

           d.    Turning to Gambling and Drugs to Combat Stress ....... 10

           e.    Through it All, Remaining a Loving Father and Committed to his Charity ............................... 12

           f.    Accepting full responsibility for his conduct and has begun making amends with those he hurt ............ 13

        2.    Mr. Schwartz's Severe Gambling Disorder and Treatment ........................................... 14

           a.    Mr. Schwartz's Gambling Disorder Diagnosis ............. 17

        3.    Character Letters ...................................................................... 20

           a.    Letter from Mr. Schwartz's mother .............................. 20

           b.    Letters from his friends ................................................. 21

           c.    Letter from his former employee ................................... 26

           d.    Letters from his mental health care providers and clergy .......................................................... 26

           e.    Sentencing Recommendation by The Aleph Institute ........................................................ 30

     B.    Nature and Circumstances of the Offense (§ 3553(a)(1)) .................. 32

     C.    The Need for the Sentence Imposed to: .............................................. 39

        1.    Reflect the seriousness of the offense, promote respect for the law and provide just punishment (§ 3553(a)(2)(A)) ................................................. 39

        2.    Afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) ....................................... 39

        3.    Protect the public from future crimes of the defendant (§ 3553(a)(2)(C)) ...................................... 42

i

TABLE OF CONTENTS
(continued)

Page

4.    Provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner (§ 3553(a)(2)(D)) ...... 42

D.    The Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6)) ....................................................................... 43

E.    The Need to Provide Restitution to Victims of the Offense  (§ 3553(a)(7)) ............................................................................ 46

III.    CONCLUSION ....................................................................... 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

DB2/ 31399753.1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Gall v. United States*,
  552 U.S. 38 (2007)...............................................................................4, 6, 7

*Kimbrough v. United States*,
  552 U.S. 85 101 (2007)......................................................................2, 4, 5, 6

*Koon v. United States*,
  518 U.S. 81 (1996)......................................................................................5

*Pepper v. United States*,
  131 S. Ct. 1229 (2011)...............................................................................2, 7

*Rita v. United States*,
  551 U.S. 338 (2007)....................................................................................5

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................................8

*United States v. Andrew Caspersen*,
  No. 16-cr-00414-JSR (SDNY).................................................................44

*United States v. Checoura*,
  176 F. Supp. 2d 310 (D. N.J. 2001)........................................................6

*United States v. Dikiara*,
  50 F. Supp. 3d 1029 (E.D. Wis. 2014).............................................passim

*United States v. Hendrickson*,
  25 F. Supp. 3d 1166 (N.D. Iowa 2014)...................................................6

*United States v. Liu*,
  267 F. Supp. 2d 371 (E.D.N.Y. 2003).....................................................6

*United States v. Peterson*,
  363 F.Supp.2d 1060 (E.D. Wis.)...............................................................45

*United States v. Ressam*,
  679 F.3d 1069 (9th Cir. 2012)..................................................................43

iii

*United States v. Reyes-Medina*,
   683 F.3d 837, 841-42 (7th Cir. 2012)..................................................................7

**OTHER CASES**

*United States v. Decrescenzo*,
   No. 3:14-CR-00230-JBA ..................................................................passim

**STATUTES**

18 U.S.C. § 3553............................................................................................43

18 U.S.C. § 3553(a) .................................................................................passim

18 U.S.C. § 3553(a)(1).......................................................................6, 7, 32

18 U.S.C. § 3553(a)(1)(D).....................................................................31, 32

18 U.S. C. § 3553(a)(2)(A).............................................................................38

18 U.S.C. § 3553(a)(2)(B).............................................................................39

28 U.S.C. § 991(b)(1)(B).............................................................................43

18. U.S.C. § 3553(a)(2).............................................................................48

18. U.S.C. § 3553(a)(2)(C).............................................................................42

18. U.S.C. § 3553(a)(2)(D).............................................................................42

18. U.S.C. § 3553(a)(6).............................................................................43

18. U.S.C. § 3553(a)(7)) .............................................................................45

U.S.S.G. § 5H1.4 .......................................................................................6, 7

**OTHER AUTHORITIES**

Ashely Cullins, Hollywood Reporter (May 17, 2016, 4:30 PM),
   Alanis Morrissette Claims Ex-Business Manager Stole $4.7 M,
   http://www.hollywoodreporter.com/thr-esq/alanis-morrissette-
   claims-business-manager-895175 ..........................................................41

Christine Reilly and Nathan Smith, *The Evolving Definition of
   Pathological Gambling in the DSM-5* (2013) ...................................16

iv

Jeffrey A. Dubin, *Criminal Investigation Enforcement Activities and Taxpayer Noncompliance* ........................................................................... 42

Nat'l Gambling Impact Study Comm'n, Nat'l Gambling Impact Study Comm'n Final Report 4-1 (1999). .............................................. 15, 16

*Shuffling the Deck: The Role of the Courts in Problem Gambling Cases*, by Judge Moss, vol. 6 UNLV Gaming L. J. 145 (2016) ........................ 15

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

1
## DEFENDANT'S SENTENCING POSITION

2
## I.     INTRODUCTION

3
Jonathan Schwartz seemingly had it all: a great family, a well-paying and

4
prestigious job representing high-profile clients at a respected business

5
management company, and a reputation in the community for hard work, client

6
service, and caring for others.  Unfortunately, beneath this veneer of happiness and

7
success lurked a double and dark life that Mr. Schwartz was leading where he was

8
addicted to gambling and drugs for years, speaking and meeting in secret with his

9
bookie hundreds of times, stealing from his clients over $7 million in cash,

10
blowing through this money to feed his gambling addiction, and then lying to his

11
family, friends, partners and employees about his actions.  Mr. Schwartz quite

12
correctly describes his conduct as deceitful, degenerate, disgusting, and deplorable.

13
In May 2016, Mr. Schwartz's double life came crashing to an end.  His

14
thefts were discovered; his gambling addiction and lies revealed; his reputation

15
shattered; his job terminated; his finances ruined; his family destroyed.  At that

16
point, Mr. Schwartz  had two choices: he could try to continue to conceal and

17
cover-up his actions and live in a world of denial or he could reveal, reform and

18
rehabilitate and begin the very difficult and long road back to being an honest,

19
respectable, and productive member of society.  Mr. Schwartz chose the latter path.

20
As part of his recovery, starting on May 9, 2016, he no longer gambled or used

21
drugs and began an intensive daily treatment program to deal with his gambling

22
addiction – he has been sober for over 350 days at this point.  He instructed his

23
attorney Nathan Hochman to immediately contact the U.S. Attorney's Office at the

24
very onset of their investigation and inform them that he wanted to plead guilty

25
pre-indictment to the full extent of his thefts and failure to pay taxes and cooperate

26
if possible.  He signed a pre-indictment plea agreement, waived indictment, and

27
pled guilty to every count charged in the Information and will sign closing

28
agreements that will assess all his back taxes as well as interest and a 75% civil

1

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

1  fraud penalty in excess of $1 million.  He agreed to give up his CPA license.  To

2  proactively promote deterrence and try to spread the message of the consequences

3  that can occur if one steals from one's clients and succumbs to one's addictions, he

4  wrote an open letter to the community that was published by The Hollywood

5  Reporter and viewed tens of thousands of times over social media.  That letter

6  candidly admitted his crimes and his gambling addiction and implored others who

7  might be in a similar situation to get help and not follow his ruinous path.  Over the

8  past year, he has worked diligently on behalf of non-profit organizations.  While

9  none of these actions excuse his serious misconduct, Mr. Schwartz has taken every

10  step he can at this point to begin to address his severe gambling disorder, come

11  clean with his crimes, and apologize and start to make amends to those he has hurt.

12       In deciding what sentence is sufficient but not greater than necessary to

13  achieve the aims of sentencing, the Probation Officer has calculated a total offense

14  level of 26, a criminal history category of I, and an advisory guideline sentencing

15  range of 63 to 78 months, and has recommended a term of 63 months'

16  imprisonment.  (PSR ¶¶ 29-59, 107; Recommendation Letter).  However, the

17  advisory guideline range is but one factor to be considered in determining a

18  sentence that is "sufficient, but not greater than necessary."  *See Kimbrough v.*

19  *United States*, 552 U.S. 85 101 (2007) (quoting § 3553(a)).  As set forth herein,

20  Mr. Schwartz respectfully submits that a sentence of imprisonment of 12 months

21  and a day followed by 12 months of home detention and 2,000 hours of community

22  service, is appropriate pursuant to 18 U.S.C. § 3553(a).

23       This case demonstrates in a compelling way why the Supreme Court rejected

24  mandatory application of the Sentencing Guidelines and returned discretion to the

25  district court "to consider every convicted person as an individual and every case

26  as a unique study in the human failings that sometimes mitigate, sometimes

27  magnify, the crime and the punishment to ensue."  *Pepper v. United States*, 131 S.

28  Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).  The statutory

2

factors supporting a sentence of 12 months and a day imprisonment, 12 months of home detention and 2,000 hours of community service are outlined below.  Among other factors in this case:

- Mr. Schwartz is a 47-year old father of three, who, prior to his offenses in this case, had led a hard-working, honest, law-abiding,  and family-oriented life;

- Mr. Schwartz' childhood was severely dysfunctional with a mother who verbally and physically abused him and a father who abandoned the family for a life of gambling, drug dealing, and drug use.  Notwithstanding these hurdles, Mr. Schwartz was able to overcome them to graduate college, obtain a CPA license, and become a partner in a successful business management company;

- The fraud and tax activities that form the offense conduct were intertwined with and significantly driven by Mr. Schwartz's now diagnosed severe gambling disorder.  Mr. Schwartz did not act out of a desire to hurt his clients or his business partners; instead he embezzled millions of dollars of cash to pay off his gambling debts as a result of his pathological gambling addiction.  Like many individuals suffering from addictions, he did not rationally weigh the costs of his actions of stealing from his clients and not paying taxes on the stolen funds but acted impulsively without appropriate forethought being given to the future ramifications of his actions.  Part of this disease is the delusion that one can "catch one's losses" by just winning the next bet, leading the addict down a toxic spiral of betting more, losing more, and stealing more;

- Mr. Schwartz very promptly accepted responsibility in this case, approaching the U.S. Attorney through his counsel at the onset of their investigation, entering into a pre-indictment plea agreement, pleading guilty to every count in the Information, entering into closing agreements with the IRS to assess the full extent of his tax liability, interest, and a 75% civil fraud penalty of over $1 million, and cooperating with the IRS in its criminal investigation of others.

- Mr. Schwartz proactively published an apology letter to his community, former

3

1   clients, and former business partners, taking full responsibility for his actions in

2   an attempt to deter others to avoid his egregious mistakes.

3   • Mr. Schwartz has already been punished for his egregious conduct beyond any

4   criminal sentence that can be imposed: his wife who was his high school

5   sweetheart has left him; he is estranged from his three sons; he has lost his job,

6   his clients and his partners; he destroyed his reputation that he built over almost

7   two decades; he gave up his CPA license; and he will be responsible for paying

8   off an over $8.7 million restitution and tax judgment probably for the rest of his

9   life.;

10  • Mr. Schwartz poses no risk of recidivism and there is no need to protect the

11  public from further criminal conduct by giving him a lengthy prison sentence.

12      These and other factors, individually and in combination, demonstrate that a

13  sentence of 12 months and a day imprisonment, 12 months of home detention, and

14  2,000 hours of community service is "sufficient, but not greater than necessary," to

15  comply with the statutory goals of sentencing.  18 U.S.C. § 3553(a); *Kimbrough*,

16  552 U.S. at 109.

17  **II.    ANALYSIS OF SENTENCING FACTORS**

18      The Court must impose a sentence consistent with the mandate of 18 U.S.C.

19  § 3553(a).  The Sentencing Guidelines are only a starting point, one of many

20  factors to be weighed when selecting a disposition that is sufficient but not greater

21  than necessary to satisfy the purposes and goals set forth in 18 U.S.C. §3553(a).

22  *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (guideline range should not be

23  presumed to be reasonable); *Kimbrough*, 552 U.S. at 90 (guidelines only "one

24  factor among several courts must consider in determining an appropriate

25  sentence").  Additionally, the Court is no longer hemmed in by the traditional

26  departure analysis.  Rather, the primary objective for this, as any, sentencing is to

27  "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S.

28  at 50.  As Justice Kennedy observed even pre-*Booker*, "[i]t has been uniform and

4

DB2/ 31399753.1

1  constant in the federal judicial tradition for the sentencing judge to consider every

2  convicted person as an individual and every case as a unique case study in human

3  failings that sometimes mitigate, sometimes magnify, the crime and punishment to

4  ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

5       The "overarching provision" of 18 U.S.C. § 3553(a) is, of course, to impose

6  a sentence *sufficient, but not greater than necessary*, to meet the goals of

7  sentencing established by Congress. *Kimbrough*, 552 U.S. at 101. Those statutory

8  goals include "to reflect the seriousness of the offense," "to promote respect for the

9  law," "to provide just punishment for the offense," "to afford adequate deterrence

10  to criminal conduct," and "to protect the public from further crimes of the

11  defendant." *Id.*; *see* 18 U.S.C. § 3553(a). The statute further provides that, in

12  determining the appropriate sentence, the court should consider a number of

13  factors, including "the nature and circumstances of the offense," "the history and

14  characteristics of the defendant," "the sentencing range established" by the

15  Guidelines, "any pertinent policy statement" issued by the Sentencing Commission

16  pursuant to its statutory authority, and "the need to avoid unwarranted sentence

17  disparities among defendants with similar records who have been found guilty of

18  similar conduct." *Id.* "In sum, while the statute still requires a court to give

19  respectful consideration to the Guidelines, *Booker* permits the court to tailor the

20  sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101

21  (internal quotations and citations omitted). If a sentence other than a guidelines

22  sentence of imprisonment would be sufficient to meet the statutory goals of

23  sentencing, then the Court *must* impose such an alternative because a lengthy

24  imprisonment sentence would be a "greater than necessary" sentence. 18 U.S.C. §

25  3553(a).

26       In his concurring opinion in *Rita v. United States*, 551 U.S. 338, 367 (2007),

27  Justice Stevens wrote: "I trust that those judges who have treated the Guidelines as

28  virtually mandatory during the post-*Booker* interregnum will now recognize that

5

1   the Guidelines are truly advisory." The decisions in *Kimbrough* and *Gall* have

2   reinforced Justice Stevens' remark and the authority of district courts to fashion the

3   sort of sentence that fits the crime and the individual.

4        In recent years, courts have acknowledged the impact of addiction in the

5   sentencing process. Despite the Sentencing Commission's 2003 pronouncement

6   that "[a]ddiction is not a reason for a downward departure[,]" (U.S.S.G. § 5H1.4),

7   a number of courts both before and after this policy statement was issued have

8   viewed addiction as a form of diminished capacity warranting downward

9   departures and variances.

10       In *United States v. Hendrickson*, 25 F. Supp. 3d 1166, (N.D. Iowa 2014),

11  and in the context of drug addiction, the court acknowledged:

12               By physically hijacking the brain, addiction diminishes
                the addict's capacity to evaluate and control his or her
13               behaviors. Rather than rationally assessing the costs of
                their actions, addicts are prone to act impulsively,
14               without accurately weighing future consequences.

15       The court continued:

16               [B]ecause addiction is a serious brain disease that
                diminishes one's capacity to evaluate decisions and
17               regulate behavior, I consider addiction to be a generally
                and substantially mitigating factor under § 3553(a)(1),
18               weighing in favor of a downward variance here.

19       The court concluded that "the mitigating effects of addiction under §

20  3553(a)(1) ... far outweigh any advisory policy statements under § 3553(a)(5)." *Id.*

21  at 1179.

22       Other courts have focused specifically on gambling addiction in finding

23  downward departures appropriate. *See United States v. Liu*, 267 F. Supp. 2d 371,

24  375 (E.D.N.Y. 2003)(granting a downward departure in light of defendant's

25  pathological gambling addiction, which "interfered with [his] ability to control

26  behavior that he knew was wrongful"); *United States v. Checoura*, 176 F. Supp. 2d

27  310, 314 (D. N.J. 2001)(granting downward departure in determining defendant

28  "did not choose to gamble compulsively, any more than other compulsives choose

6

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

1  . . . to wash their hands after touching every doorknob").

2  In *United States v. Dikiara*, a leading case in the area of gambling addiction

3  and sentencing, the court acknowledged U.S.S.G. § 5H1.4 (policy statement) but

4  correctly stated "such provisions are not binding on the court in determining the

5  sentence under § 3553(a)." 50 F. Supp. 3d 1029, 1033 n. 1 (E.D. Wis. 2014),

6  citing *United States v. Reyes-Medina*, 683 F.3d 837, 841-42 (7th Cir. 2012). The

7  court went on to state, "defendant's gambling addiction was directly relevant to the

8  sentencing factors under § 3553(a)." *Id*. As science and medicine continue to

9  reveal the true impact of gambling disorder on the human brain, it is extremely

10  important to take into consideration such condition in conducting the factors

11  analysis under Section 3553(a).

12  **A.    History and Characteristics of the Defendant  (§ 3553(a)(1))**

13  The requirement that courts consider the "history and circumstances" of

14  each defendant  under 18 U.S.C. § 3553(a)(1) reflects the "federal judicial tradition

15  for the sentencing judge to consider every convicted person as an individual and

16  every case as a unique study in the human failings that sometimes mitigate,

17  sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52

18  (citations omitted). The Supreme Court has emphasized that "the fullest

19  information possible concerning the defendant's life and characteristics" is

20  "[h]ighly relevant — if not essential — to [the] selection of an appropriate

21  sentence." *Pepper*, 562 U.S. at 488 (internal citations omitted). Considering the

22  widest information available "ensures that the punishment will suit not merely the

23  offense but the individual defendant." *Id*.

24  The importance of considering a defendant's history and characteristics as

25  part of the analysis under § 3553(a) has been appropriately described by one court:

26  But, surely, if ever a man is to receive credit for the good
   he has done, and his immediate misconduct assessed in
27  the context of his overall life hitherto, it should be at the
   moment of his sentencing, when his very future hangs in
28  the balance. This elementary principle of weighing the

7

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), aff'd 301 Fed. Appx. 92 (2d Cir. 2008).

1.   Personal Background

a.   ***Growing Up with an Abusive Mother and a Gambling and Drug-Addicted Father***[1]

Jonathan Schwartz was raised in a small town in upstate New York by a mother who verbally and physically abused him, and a father who abandoned the family for a life of gambling, drug dealing, and drug use. His mother, likely induced by the incredible stress caused by his father's deplorable lifestyle, constantly screamed at him, hit him, and made him feel as though everything he did was wrong. Mr. Schwartz and his brother, Brian, had little contact with their father or any of their paternal family as they showed very little interest in bonding with the boys. His parents divorced when he was just 4 years old—which was devastating for the boys. Mr. Schwartz's maternal family, on the other hand, provided the love and support he and his brother desired and helped raise them as their mother worked several jobs to provide food and shelter.

Despite growing up in a dysfunctional family, Mr. Schwartz was a good student and focused on becoming an accountant from a very early age. His 12th grade accounting teacher observed his natural talent for accounting and encouraged him to pursue a career in business.

---

[1] This section emanates from Mr. Schwartz's letter to the Court, Exhibit A to the Declaration of Nathan Hochman, paragraphs 28, 54, 63-105 of the Presentence Report, and the many character letters submitted in support of Mr. Schwartz, Exhibits E through H.

8

DB2/ 31399753.1

b.  ***College Years: Beginnings of Accounting Career and Gambling Addiction***

Mr. Schwartz started college at CW Post Long Island University and finished his freshman year on the honor roll.  He then transferred to State University New York to attend their highly acclaimed accounting program.  Mr. Schwartz continued to work hard and received high marks his sophomore year.

By his junior year, Mr. Schwartz began experimenting with marijuana and began gambling.  He and a friend assumed the role of bookie and began taking bets from their friends.  This operation quickly spiraled out of control as Mr. Schwartz himself began placing his own bets which increased in size and frequency.  His grades deteriorated and he eventually racked up a gambling debt of $10,000.  Given his father's predisposition for gambling, Mr. Schwartz knew he was in trouble and proceeding down a dangerous and destructive path.

Seeing the writing on the wall, Mr. Schwartz packed his belongings and moved across the country to attend San Francisco State University.  There, he refocused on his studies and eventually graduated with a Bachelor's of Science degree in accounting.  In 1992, he began his career as a certified public accountant at a small firm in San Francisco.

c.  ***Building a Successful Career and Starting a Family***

Shortly after college, Mr. Schwartz married his high school sweetheart, Meridith, who was five months pregnant at the time with their first son, Logan.  He continued working in San Francisco for four years, honing his basic accounting and business management skills, and raising his young family in a small apartment.  Mr. Schwartz's first opportunity to further his career came when his cousin called and offered him a position as a staff accountant in Los Angeles.  Mr. Schwartz and the family packed their bags and moved to a very small apartment in Los Angeles in April of 1995.

Mr. Schwartz made the best of this opportunity and worked hard to earn the

9

respect of his colleagues.  He made sure he was the first to arrive in the office and the last one to leave at night.  Mr. Schwartz's hard work and dedication paid off and he eventually joined GSO as a business manager in February of 2000.  In a few short years, Mr. Schwartz became the youngest partner of the firm and grew his business to be one of the strongest in the industry.  He worked nights and weekends with a compulsive determination to provide his family with the life that he never had.

### d.    ***Turning to Gambling and Drugs to Combat Stress***

Although he made an excellent living and lived a seemingly perfect life, he was unable to enjoy his success.  On the surface, it appeared he had the perfect life.  On the inside, however, Mr. Schwartz was insecure and hampered by feelings of inadequacy and fear that he was not good enough or worthy of anyone's respect.  He constantly felt the stress of underperforming and losing all that he had accomplished with his business.  Instead of discussing his struggles with his family, partners and friends, Mr. Schwartz lied to them and maintained a "business as usual" outward appearance.  The long hours and stress of fulfilling his client's demands led him to use drugs (mostly marijuana) and alcohol in an attempt to ease his stress.  In 2015, Mr. Schwartz began using cocaine daily despite the risks it posed with his heart condition.  Although the drugs and alcohol provided a temporary distraction, the stress, lack of sleep, and drug use only served to cloud his thinking and judgment.  Mr. Schwartz's life was becoming unraveled.

With the increased stress of his job taking a toll on him physically and mentally, Mr. Schwartz again turned to gambling in an attempt to take his mind off of the stress.  First, he wagered a couple hundred dollars on football games.  But that quickly increased to thousands of dollars on multiple games each week.  His weekend bets soon totaled over $50,000.  He began spending more time on the phone with his bookie than with his family—settling the past week's bets and placing new bets.  *See* Exhibit B (Telephone calls between Jonathan Schwartz and

10

his bookie).  He had to pay his bookie large sums of cash or he would get cut off. The ferocity and enormity of Mr. Schwartz's pathological and severe gambling addiction can be measured as well in the amounts wagered and lost.  Mr. Schwartz estimates that he wagered over $21 million from 2009-2015 in sports bets, losing approximately $9 million in cash, over $7 million of which was stolen from his clients.

Mr. Schwartz felt like a degenerate gambler and realized he was turning into the same gambling addict that his father was.  He was living a double life.  His family was entirely unaware that he was gambling huge amounts of cash almost on a daily basis—neither were his friends, clients or partners.  His client roster was filled with A-list celebrities, but Mr. Schwartz was calling his bookie every day and struggling with his finances.  As the gambling increased, he needed more and more money to fuel his addiction.

This is when Mr. Schwartz's life truly began to spiral out of control.  It started when he "borrowed" a little from clients, with the hopes that he would be able to pay them back if he won that night's bet.  Mr. Schwartz readily admits that the term "borrowed" merely explains his perspective at the time.  He never sought his client's permission to "borrow" their money to fuel his gambling addiction. Instead, he stole their money believing that one big win would allow him to put it back without their knowing.

This strategy quickly devolved into a toxic game of chasing his losses by stealing from his clients and business partners to fund his addiction.  He kept telling himself that he just needed one lucky break, and he would be able to pay all of the money back and no one would know.  That lucky break never came.  One theft became dozens of thefts, which became over one hundred thefts.  To cover up his gambling addiction and imploding life, Mr. Schwartz lied repeatedly to his clients, partners, employees and family.  While he should have reached out to his business partners or family — whom he now realizes would have helped him—he

11

DB2/ 31399753.1

1   instead continued to tell them lies.  Mr. Schwartz was ashamed, scared, and utterly

2   disgusted with himself.  He panicked and continued to chase his losses; clinging to

3   the delusion that one big win would allow him to pay back the money he

4   "borrowed."  Mr. Schwartz now knows this was an "utter fantasy fueled by his

5   addiction."

6        Mr. Schwartz hid his addiction from everyone until that fateful day when his

7   jig was up.  As Mr. Schwartz described in his public apology to his community,

8   former clients, business partners, and his family, he is thankful that his "lucky

9   break" never came:

> I say thankful[] because when I was finally caught, a bright spotlight shined on my deplorable conduct.  I could not hide any longer and hit rock bottom.  By seeing how pathetic I had become, I finally got the courage to ask for help.

13  Exhibit C, Jonathan T. Schwartz Letter, Hollywood Reporter, April 11, 2017.

            e.    ***Through it All, Remaining a Loving Father and Committed to his Charity***

16        Despite the chaos of his stressful work, gambling addiction and damaging

17  drug use, Mr. Schwartz has tried to be a caring father and do the best job he could

18  to raise his three sons correctly—to instill in them proper values and set them on

19  the path to becoming great men.  He coached their sports teams, took family

20  vacations, and tried to be the father he never had.  His children and wife were

21  proud that he was a leader in his field, respected by his peers, and relied upon by

22  his clients.  Part of the utter humiliation, shame and disappointment Mr. Schwartz

23  feels is how he let his wife and sons down.  They counted on him to show them

24  how to live life at its highest ethical, moral and legal levels, and instead his actions

25  have served as examples of what not to do.  As Mr. Schwartz has stated, a huge

26  part of his amends for his actions are to his family, and he has committed himself

27  to earning back their respect and trust no matter how long that takes to do.

28        In late 2010, Mr. Schwartz discovered that he had nearly 100% blockage in

                                    12

DB2/ 31399753.1

1  his coronary artery that required immediate surgery.  Around the same time, one of

2  his childhood friends died of a heart attack at the age of forty.  These life-changing

3  events lead Mr. Schwartz to form a strategic partnership with Cedars-Sinai to raise

4  money to pay for CT Scan Angiogram testing for those who could not afford it.

5  Mr. Schwartz formed the non-profit HeartView Global Foundation (HVGF) which

6  has raised over $250,000 in net proceeds to date.  Half of the proceeds are used to

7  pay for people to take this non-invasive test and the other half of the proceeds are

8  contributed to research on early detection of coronary disease.

9            f.  ***Accepting full responsibility for his conduct and has begun making amends with those he hurt***

10

11      Mr. Schwartz makes no excuses for his incredibly stupid and destructive

12  misconduct.  He is acutely aware that he left a large swath of destruction in his

13  wake.  He offers no excuses for the fact that he violated the trust of his clients and

14  partners and lied repeatedly while he engaged in his destructive behavior.  He

15  acknowledges that he broke the law by embezzling from his clients and not paying

16  taxes on those funds.

17      Shortly after Mr. Schwartz's destruction was unveiled, he sought legal

18  counsel from Nathan Hochman regarding how his matter would proceed through

19  the civil and criminal courts.  Instead of waiting for the government to finish its

20  investigation, bring charges, and prove its case at trial, Mr. Schwartz instructed Mr.

21  Hochman to proactively approach the U.S. Attorney's Office to enter a pre-

22  indictment plea agreement.  Mr. Schwartz entered into that plea agreement, waived

23  indictment, and pleaded guilty to the every crime charged in the Information.  Mr.

24  Schwartz also offered to cooperate with the government's investigation and toward

25  that end met with the IRS agents twice and made monitored phone calls at their

26  behest.  While that cooperation did not amount to substantial assistance meriting a

27  motion by the government under Section 5K1.1, such cooperation was consistent

28  with Mr. Schwartz's overall approach to do all he can to make amends for his

wrongful conduct.  He has already received a life sentence of shame; he is before this Court now to take full responsibility for the devastation he caused.

Mr. Schwartz has also sought treatment for his gambling and drug addictions.  Since May 9, 2016, Mr. Schwartz has lived a life of sobriety without gambling or using drugs or alcohol.  In June 2016, he was admitted to Beit T'Shuvah's Intensive Outpatient Program for problem gamblers.  He embraced the program and spent three months confronting his addiction and learning the tools of rehabilitation.  This included acknowledging a higher power than himself and committing each day to maintain a life of abstinence.  As of the date of this filing, Mr. Schwartz has been sober for over 350 days.  He attends 3-4 Gambler's Anonymous or Alcoholics Anonymous meetings per week, and speaks with his sponsor daily.  He is now a sponsor himself to another addict.

As part of his recovery, Mr. Schwartz also spends time volunteering in the community.  He helps his local temple on an as-needed basis and he volunteers at the Aleph Institute by making phone calls to people who have an incarcerated family member encouraging them to participate in a bi-weekly support group.  He also delivers food to mentally ill patients and visits with senior citizens to provide support and comfort.

Mr. Schwartz has forgiven his mother for the abuse he endured during his childhood.  They reconnected two years ago following her cancer diagnosis.  He calls her daily to provide support as she battles for her life against stage four lung cancer and brain cancer.  His father passed away February of this year.   Despite his father's many flaws, Mr. Schwartz regrets that he was never able to reconcile with him.  Mr. Schwartz prays daily for him and hopes that his father has found peace.

2.    Mr. Schwartz's Severe Gambling Disorder and Treatment

Dr. Marc Potenza, Professor of Psychiatry at the Yale University School of Medicine, certified by the American Board of Psychiatry and Neurology in both

14

DB2/ 31399753.1

1  Psychiatry and Addiction Psychiatry, is one of the world's leading researchers and

2  authorities in the field of addiction and gambling disorder.  Dr. Potenza has

3  evaluated Mr. Schwartz and has provided his expert opinion regarding his

4  diagnosis of Mr. Schwartz with a severe gambling disorder and how that gambling

5  disorder impacted Mr. Schwartz's criminal conduct in the instant matter.  See

6  Exhibit D, Report on the Gambling Disorder of Jonathan Schwartz, authored by

7  Dr. Marc Potenza (hereinafter "Potenza Report").  The Potenza Report was

8  prepared to assist the Court in understanding Mr. Schwartz's diagnosis and how a

9  gambling disorder impacts the lives of everyone it touches, which as is the case

10  here, includes one's employer, clients, family, community and the courts.

11      Dr. Potenza describes gambling as "placing something of value at risk

12  (usually money) in the hopes of gaining something of greater value."  Potenza

13  Report, ¶ 10.  In this country, multiple studies have confirmed that the majority of

14  adults gamble.  *Id*. at ¶ 11.  And despite gambling being a normative adult behavior

15  in the United States and most places around the world where it is legal, only a

16  small percentage of adults are diagnosed with gambling disorder.  *Id*. at ¶¶ 11, 12.

17  For example, of the approximately 125 million American adults who engage in

18  some form of gambling behavior each year, less than 2% would likely be

19  diagnosed as pathological gamblers (2.2 million).  *See Shuffling the Deck: The*

20  *Role of the Courts in Problem Gambling Cases*, by Judge Moss, vol. 6 UNLV

21  Gaming L. J. 145 (2016), citing Nat'l Gambling Impact Study Comm'n, Nat'l

22  Gambling Impact Study Comm'n Final Report 4-1 (1999).

23      Over the years as researchers have studied this pervasive disorder, a range of

24  terms have been used to describe "excessive forms of gambling[.]"  Potenza

25  Report, ¶ 12.  The varying terms include: "'disordered gambling,' 'gambling

26  disorder,' 'compulsive gambling,' 'addictive gambling,' 'ludomania,' 'problem

27  gambling,' and 'pathological gambling,' among others."  *Id*.  Because the term

28  gambling disorder is used in the current and 5th edition of the Diagnostic and

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

DB2/ 31399753.1

Statistical Manual ("DSM-5") of the American Psychiatric Association (Association 2013), Dr. Potenza used the term "gambling disorder" in his examination of Mr. Schwartz. *Id.* As discussed more below, Dr. Potenza's report is consistent with the leading literature in the field.

Gambling disorders were reclassified over twenty years ago from an impulse control disorder to an addiction. This change from an impulse control disorder to an addiction was recently described as follows:

> The rationale for this change is that the growing scientific literature on PG [pathological gambling] reveals common elements with substance use disorders. Many scientists and clinicians have long believed that problem gamblers closely resemble alcoholics and drug addicts, not only from the external consequences of problem finances and destruction of relationships, but, increasingly, on the inside as well. According to Dr. Charles O'Brien, chair of the Substance-Related Disorders Work Group for DSM-5, brain imaging studies and neurochemical tests have made a "strong case that [gambling] activates the reward system in much the same way that a drug does." Pathological gamblers report cravings and highs in response to their stimulus of choice; it also runs in families, often alongside other addictions. Neuroscience and genetics research has played a key role in these determinations.

Christine Reilly and Nathan Smith, *The Evolving Definition of Pathological Gambling in the DSM-5* (2013), 3.

The current DSM-5 defines a gambling disorder as "persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress." DSM-5. Some of the diagnostic criteria include: (1) is preoccupied with gambling (e.g., preoccupied with reliving past gambling experiences, handicapping, or planning the next venture, or thinking of ways to get money with which to gamble); (2) after losing money, often returns another date to get even ("chasing" one's losses); (3) often gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed); (4) lies to conceal the extent of involvement with gambling; and (5) has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling.

16

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

As explained by Dr. Potenza, "psychiatric diagnoses per diagnostic criteria such as defined in the DSM-IV and DSM-5 are considered the 'gold standard' for defining cases of a specific disorder and are critical to understanding the prevalence of the disorder." Potenza Report, ¶ 18.

a.    *Mr. Schwartz's Gambling Disorder Diagnosis*

On December 2, 2016, Dr. Potenza conducted a clinical interview of Mr. Schwartz. Dr. Potenza employed the interviewing techniques that he typically uses during clinical assessments in his clinical practice. Exhibit D, ¶ 27. As is typical in his assessment procedure, Dr. Potenza had Mr. Schwartz complete several self-report instruments including the South Oaks Gambling Screen, Barratt Impulsivity Scale and the Toronto Alexithymia Scale. *Id*. The first is a widely used gambling screen that assesses lifetime gambling-related attitudes and behaviors. *Id*. The second is a widely used measure that assesses attentional, motor and non-planning aspects of impulsivity. The third is a widely used scale to assess difficulties in identifying and describing emotions. *Id*. Dr. Potenza's report is based upon the clinical interview, the testing that was performed, and additional information he reviewed including an analysis of Mr. Schwartz's very large volume of phone calls with his bookie, and letters received on Mr. Schwartz's behalf in connection with his upcoming sentencing.

Ultimately, Dr. Potenza made the following diagnosis[2]:

---

[2] The results of the diagnostic tests administered by Dr. Potenza were as follows: (1) SOGS score of 18, indicating severe probable pathological gambling; (2) Toronto Alexithymia Scale score of 67 being greater than the threshold (61 or greater) used to identify individuals with alexithymia (a tendency to have limited abilities to identify emotional states, which has also been linked to pathological gambling, particularly in individuals with strategic forms of gambling problems like sports betting); and (3) Barratt Impulsiveness Scale score of 82 is higher than Dr. Potenza typically sees in healthy control subjects in his research program; in a group of several hundred such individuals, he sees average scores of 54.5 (Mr.

17

1
2
3
4

> Based on my background, training and experience in the field of gambling disorder, I can state to a reasonable medical certainty that Mr. Schwartz meets the criteria for a severe gambling disorder in reported remission (what was termed pathological gambling in the DSM-IV and is continued to be called pathological gambling in ICD-10).

*Id*. at ¶ 36.

In rendering his diagnosis, Dr. Potenza made the following observations:

- Mr. Schwartz's belief over the years that he could win back his money by continuing to make sports bets and hoping that his luck would turn around is consistent with the criteria in the DSM-5 for a gambling disorder involved with "chasing one's losses."  Also noteworthy is that Mr. Schwartz did not act of a desire to hurt his clients or his partners at GSO; instead, he stole to pay off his gambling debts and as a result of his severe gambling disorder.  *Id*. at ¶ 36.

- Mr. Schwartz' criminal activity to support his gambling would be consistent with a severe form of the disorder (Toce-Gerstein, 2003).  *Id*. at ¶ 36.

- Mr. Schwartz' experience of trauma in his early childhood is a significant factor associated with the development of gambling problems (Scherrer et al, 2007; Steinberg et al, 2005).  *Id*. at ¶ 38.

- He lied to his partners, his clients, and everyone around him to try to hide his gambling activities.  Rather than being able to stop and admit his wrongdoing, Mr. Schwartz continued for years increasing his bets, his losses, his lies and his thefts.  *Id*. at ¶ 29C.

Dr. Potenza indicated that "[g]iven [Mr. Schwartz's] ability to obtain large amounts of money, the extent and financial impact of his gambling are

_____

Schwartz's high level of impulsivity is consistent with his addictive tendencies, including with respect to gambling).  *Id*. at ¶¶ 36-37.

18

DB2/ 31399753.1

considerably substantial and *amongst the highest I have encountered during many examinations of people with gambling disorders*." *Id*. at ¶ 36.

In his report, Dr. Potenza described various treatment approaches that Mr. Schwartz will benefit from if he continues to adhere to the treatment. Dr. Potenza emphasizes the importance of attending Gamblers Anonymous (GA) as a behavioral approach that has successfully worked with hundreds of people he has treated who have been diagnosed with pathological gambling. *Id*. Interventions that target self-control over desires to gamble or making decisions to engage in non-gambling behaviors involve multiple steps and provide numerous benefits to the patient. *Id*.

Dr. Potenza remarks that Mr. Schwartz "has almost a year of abstinence since he started with outpatient programs and Gambler's Anonymous and has developed a strong support network to reinforce positive values and the importance of maintaining his abstinence." *Id*. at 39. Despite the challenges Mr. Schwartz faces in his recovery that will last his lifetime, based on his extensive background and training, Dr. Potenza observed that Mr. Schwartz's "ability to self-assess and self-realize the very negative effects his severe gambling disorder have had on all aspects of his life bodes well toward his ability to maintain his abstinence, provided he continues his hard work, effort and commitment towards maintaining his abstinence." *Id*.

Finally, Dr. Potenza offered his medical opinion to assist the Court with fashioning an appropriate sentence that should take into consideration Mr. Schwartz's "mental health status" and specifically his "severe gambling disorder." *Id*. at 41. In his professional opinion, based on his background, training, and over 20 years of experience studying addictive disorders relating to substance use and gambling, Dr. Potenza believes the empirical data "indicate that Mr. Schwartz suffered from a severe gambling disorder, a mental illness, and *there is little doubt that it contributed substantially to him losing his own money and seeking money*

19

**by fraud from others to continue on the same destructive path**." *Id.* at ¶ 41.

3.    Character Letters

Mr. Schwartz has submitted a letter to the Court explaining and expressing remorse for his conduct. Exhibit A. His mother, friends, business associates, mental health providers and religious counselors have also submitted letters attesting to the exemplary aspects of Mr. Schwartz's character including his values, his compassion, his generosity, and dedication to his family, as well as the demons he has battled since childhood, including his addictions to gambling and drugs. Exhibits E – H, J.[3] The letters collectively paint a picture of a fundamentally good and honorable person, a loving and devoted family man, an active contributor to his community, as well as a man who has struggled with and succumbed to addiction but has begun the long and arduous road to recovery.

a.    *Letter from Mr. Schwartz's mother*

Mr. Schwartz's mother has written to the Court about his character, about his deep and consuming remorse for his offense conduct, and about the toll that this case has taken on him:

> Jonathan grew up with dysfunctional parents and I thank God that my family was there for him. He was taught to be respectful of his elders and has never altered from that.
>
> I take full responsibility for taking my frustrations out on Jonathan as he was growing up. I was verbally and physically abusive and his father abandoned us. His paternal family did not seem interested in my children and it was a struggle to try and connect with them for some help. I divorced when Jonathan was four years old. Through all of this Jonathan turned out to be a wonderful, caring and giving person. He was a good student in school and proudly graduated from San Francisco State University. He graduated with an accounting degree and

---

[3] Because of the number of character letters submitted, they have been grouped into categories for the Court's convenience. The letter from Mr. Schwartz's mother is attached as Exhibit E; letters from his friends are attached as Exhibit F; a letter from his former employee is attached as Exhibit G; letters from his mental health care providers and clergy are attached as Exhibit H.

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

DB2/ 31399753.1

became a CPA.  He is a devoted friend to all which is evidenced by the fact that he still remains in touch with his childhood friends.

Jonathan and [his wife] Meridith were high school sweethearts and married young.  They relocated to California and he started a new role as a husband and father to three beautiful sons, Logan 23, Austin, 21 and Blake, 13.  He is a devoted Dad giving each child individual and collective attention.  At the same time, his consideration to me and his brother never faltered.  Always the respectful son!

...In October of 2010, Jonathan had a stent placed in his heart and thankfully used this surreal moment to help others.  He felt that he was a miracle life survivor and wanted to give back to others by forming a non-profit Heart Foundation in which half the proceeds went to pay for patients who could not afford a Coronary CT Scan which is not covered by insurance and the other half went to research led by Cedars-Sinai for early detection of coronary disease.  To date, his foundation has saved countless lives.  I am so proud of him.

Many years ago, Jonathan became obsessed with addictive habits such as gambling and drugs.  He lost everything including...a successful practice, his integrity and relationship with his clients and peers, and turned his family's life upside down.  In talking with my son, he expresses his deep remorse and is truly sorry for all the pain he has caused.  I am very proud of him for taking responsibility for his actions.  He is embarrassed for what his children now know about his disease and what they are going through.  Jonathan has promised to make it up to them and I believe in him.  Jonathan still has a young son at home and I plead that he has the opportunity to make things right for him as well as his older sons.

...I have stage four lung cancer, still under maintenance treatment and in the past Jonathan has flown up to San Francisco to be with me during my treatments and has been instrumental with sending me updates on new approaches in my field of lung cancer.  I hope to have my son whom I love so much and his family close to me.

Exhibit E.

### b.        *Letters from his friends*

Brian Gold, DDS, a childhood friend of 45 years, writes:

I am aware that Jonathan is being sentenced for wire fraud and tax evasion, but I feel his transgression is not indicative of his character.  Jonathan, as a young boy, grew up hard and unlike me and our other friends, he

didn't come from a stable household. His parents divorced when he was very young and I remember visiting him at different places with some being livable but, other places were the area's equivalent to project housing. At different times, he lived with his abusive mother and other times his "drug dealing" dad. Through it all, he was a good student, athlete and most importantly, a great friend. He never complained or became envious of his peers and in a lot of ways, his mental fortitude made him successful.

Although we were all impressed by his job and his media appearances...[h]e never became too "big" for his old friends and usually it was him pushing for all of us to hang out, when he came into town. After our friend, Larry, passed away, it was Jonathan, who used his connections and time to set up a charity to help others who also might have similar undiagnosed cardiovascular issues. This to me is indicative of Jonathan's true character...

Jonathan is truly a caring and wonderful friend. However, he is very flawed as a person. He had terrible vices. His were so encompassing, it eventually came to his demise and led to the destruction of a once charmed life. Gambling and addiction crushed the true essence of a great man. ... The action was his high and his low and now, he has nothing.

...A long prison sentence would not allow him to be a loving father to his children and make amends for his wrongdoings. After speaking with Jonathan, I know he truly feels awful for his crimes and the people he has hurt. He is not a grifter nor a con man but rather, a sick individual who truly wants to get better. I hope you consider this plea for leniency and allow Jonathan to continue his road to recovery and be a productive member of society.

Exhibit F.

Mark Gold, a childhood friend of 45 years, writes:

...[Jonathan] has been my closest friend since I was a child. We grew up in the Catskills, and were best friends from nursery school through high school. ... There are few people who know Jonathan like I do. I can say unequivocally, that Jonathan is one of the most caring, thoughtful, and generous people I have ever met. He has helped me through difficult times, and has always been a loyal friend.

Jonathan has always given back to his community, and made time to help others. ... When our mutual friend

22

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

DB2/ 31399753.1

passed away from a heart attack at the age of 40, Jonathan started Heartview Global, a foundation to educate people on heart health awareness. Through his business and music industry contacts, Jonathan helped raise hundreds of thousands of dollars for this cause.

I understand that Jonathan is being sentenced for wire fraud and tax evasion. I have spoken to him at length about the sickness that caused him to commit this federal crime. I can assure you that he is working tirelessly every day to be a better person. He has spoken on his gambling addiction to colleges and support groups. He desperately wants to rebuild his life, be a role model to his three boys, and be a contributing member of society.

...An extended prison term would be a tremendous hardship to his boys, especially Blake who is only 13 years old. ... A punitive sentence will further destroy his life. He has already destroyed his family, career and reputation. He needs another chance to rebuild his life.

Exhibit F.

Hector Roman, a friend of 30 years, name, writes:

...Over the past nearly 30 years that I have known Jonathan, I have found him to be a very kind, loving, caring and loyal person to his family and friends. While I know this is cliché, Jonathan is the type of person who would literally give you the shirt off his back if you needed it.

...[M]y heart breaks for Jonathan and his family at the situation he now finds himself in. Since I have known Jonathan he has always had one flaw to his otherwise shining personality: Addiction. As early as 18 years old, Jonathan enjoyed gambling and the occasional marijuana "toke". In college, I recall often going to Off Track Betting ("OTB") with him and other friends. While most of us saw this low stakes gambling as something which was nothing more than recreational and social fun, Jonathan's compulsive and addictive triggers made it a more personal challenge. I am aware that this gambling habit carried into his early adulthood after he graduated college because he asked me if I could help him out with some gambling debts.

...[L]ittle did we know that Jonathan, while experiencing personal and professional success, was leading a tragic and sad double life. Unbeknownst to his family, friends and colleagues, Jonathan was hiding a very dark side that I personally know has existed in his life since he was a teenager. I do not believe, but for Jonathan's gambling

23

DB2/ 31399753.1

disease and addictive personality, that he would have committed the crime that he did. I do not make this statement for leniency but as someone who understands the person that Jonathan truly is and to assist the Court in better understanding his motivation for the poor choices he has made in his life. Jonathan is someone who had it all: health, a loving family and a successful and lucrative career. Why would someone throw this all away? To me, it defies logic but for a disease that he cannot control without proper guidance.

...As a result of his behavior, his relationship with his wife, whom I first met when we were just 17 years old, and two elder children has become strained. Professionally, Jonathan has been expelled as a partner from the business management firm he was associated with. Consequently, his income stream and wonderful career as he knew it are now over. He is suffering all the severe ramifications that come with his actions.

...Jonathan has recognized that he needs help. Serious help. As of this date, Jonathan has been clean and sober for over nine months. He recently "graduated" from Beit t'shuvah after approximately months in their drug and gambling rehabilitation Intensive Outpatient Program. He started teaching a class at Beit t'shuvah to motivate the residents on positive thinking and using the 12 steps and other important tools he learned in the program. He is already working hard to improve his life and those around him.

Exhibit F.

Jeffrey Feldman, a friend of 13 years, writes:

I met Jonathan and his family about 13 years ago when I was the Youth Director at Temple Beth Haverim where both Jonathan's family and mine were members.

...One thing I quickly learned about Jonathan was what a loyal friend he was. It had nothing to do with money or material things, but had everything to do with just being there whenever or for whatever you or your family might need. Even now, with his life turned upside down, he is still the same loyal friend as always.

In May of 2012, our youngest daughter was diagnosed with a rare form of Cancer and it was a horrible few years and to say Jonathan was there every step of the way would be an understatement. As I sit and write this and recollect his undying support, it truly amazes me. He called multiple times a day. He came over all the time and formed an amazing bond with our precious

24

[daughter], a bond just as strong today. He will always be Uncle Jonathan to her.

...I don't know how I missed the signs but boy, did I miss them. Knowing now how sick he was with regards to drugs and even more with his gambling, it would be inhumane and irresponsible to not consider these issues when determining his fate. I have had many long discussions with Jonathan about what he did and how much he regrets doing it.

Exhibit F.

James Halper, a friend for over 6 years, writes

Jonathan's reputation, before his transgression, was one of tremendous integrity and he earned respect among his peers and colleagues. Otherwise, I would never have permitted my son [ ], my pride and joy, to be mentored by Jonathan.

This reputation for honesty and balanced advice was earned over many years and I know there are many people like me who believed and still do believe in Jonathan. He always made himself available to provide help to others, even when there was no business in it for himself.  His heart charity — Heartview Global Foundation --is just one example of the types of selfless acts and service that Jonathan has provided to others over the course of his 20 plus year career and his philanthropic activities.

...I know that he realizes he made a huge mistake which, if given the opportunity, he would not make again. He has told me that he realizes that he breached trust, broke the law, deeply hurt others, engaged in reckless behavior, and is committed to returning to the type of person, with excellent values, that he has been in most of his life. ...This transgression will also be life altering in terms of his career and future earnings for his family. I believe Jonathan is sincere in his intention to make the world a better place in the future and his family needs to heal from his mistake and traumatic consequences.

This is a good man who made a mistake. He has alot to contribute and offer his community in the future.

Exhibit F.

Mike Lederer, a close friend, writes:

25

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

1
2
3
4
5
6
7
8

> The Jonathan I know is a person with passion for life and people, and has always been active in the community, seeking out opportunities to make a positive difference in people's lives. I have personally attended several charitable events organized and hosted by Jonathan where several hundreds of thousand dollars were raised for the charity. I also know that Jonathan is working hard to change his life as he now has over 8 months of sobriety from his addictions and has admitted to me personally how incredibly remorseful he feels for his criminal actions, the impact it has had on his family, friends, partners and clients, and how he is committed to work every day to make amends for his actions. He has much to offer the community if he is allowed to do community service as part of his sentence.

9  Exhibit F.

10           c.     ***Letter from his former employee***

11  Lindsay Santos, a former employee, writes:

12
13
14
15
16
17
18

> The Jonathan I knew believed in me when I had absolutely no faith in myself.  Here I was, this 30 year old single mom that did nothing for him other than what my job demanded of me, yet he stood by me, encouraged me to go back to school and study for the LSAT's, watched my two boys when I had no sitter and spent countless hours on the phone with me when I went through hardships. When I didn't have enough money for Christmas, he showed up at my house with a new Xbox for my children.  He empowered me as a woman and fought GSO to give me a bigger raise and bonus; when they would not, he took it from his own salary.

19  Exhibit G.

20           d.     ***Letters from his mental health care providers and clergy***

21

22  Dr. Paul Hersh, M.F.C.C., Psy. D., who has worked with Mr. Schwartz since

23  2012 relating to couple's therapy, writes:

24
25
26
27

> Up until last year, Jonathan was effectively hiding his gambling addiction. Our work revolved around his irritability and anxiety which made his relationships chronically difficult. There was always something missing...that something was his secret of a gambling addiction that started in his college years, and progressed in to daily degenerative compulsive gambling.

28

26

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

1
2
3
4
5
6
7

I will never forget when I got the call from Jonathan admitting all that had happened. He was crying, yet he said he was so relieved. He was so tired of "being a bad person" and "being such a scumbag liar". I've heard that before from hundreds of addicts, and experience has taught me that often this is simply a temporary reprieve from their compulsive and degenerative ways. I was clear with Jonathan about this, and informed him that if he truly wished to recover, it would be extremely difficult work and take immense dedication. I communicated that although I believed he was truly regretful, the real "tell" would be his actions in the program of Gamblers Anonymous. ...

8
9
10
11
12
13
14
15
16
17

I am very happy to report that Jonathan's behavior from that day forward has been congruent with those that can establish long term recovery. ... He decided to stop drinking and Join AA as well, even though there is no sign of alcoholism. I check with his sponsor weekly, and consistently hear back that Jonathan is really doing the work. He went to both an inpatient and an intensive outpatient gambling addiction program and now continues AA and GA meetings 4-5 days a week while working on his amends. More importantly, he is living with a commitment to spiritual life/rigorous honesty. I can tell that he is connected to the pain of those he has harmed and has the fortitude and commitment to actively practice living amends in all his affairs. He now wants to help people, and takes these opportunities to do so at the various meetings he attends. Instead of running from the trauma he has put his children through, he is actively cultivating an atmosphere of trust.

18
19
20

I believe Jonathan has learned from his mistakes, and is committed to a sober life which is founded upon humility and doing the right thing. Based on my interaction with Jonathan and some of those around him, I humbly ask the court for consideration and leniency.

21    Exhibit H.

22    Finally, Mr. Schwartz has refocused his life spiritually through counseling

23    from various members of the clergy. Based on their lengthy conversations with

24    Mr. Schwartz during this tumultuous time in his life, they have all witnessed his

25    acceptance of responsibility for his actions and his commitment to making amends

26    with those he has hurt and reforming himself to live an ethical and moral life.

27    Rabbi Robbie Tombosky writes:

28

27

DB2/ 31399753.1

...[W]hile I am writing to advocate for Jonathan Schwartz, I am not doing so as his friend, associate, or acquaintance — but a member of the clergy with significant experience in addiction and rehabilitation. In fact, I have worked with other defendants facing felony related charges due to addiction in the Courtroom of Judge Mira at the Malibu Courthouse as well.

In my assessment, Jonathan Schwartz is a good man who made some very poor decisions for which he is experiencing deep remorse and regret.

...I first met Jonathan in 2012. Jonathan reached out to me, through a mutual friend, just days after the unfortunate diagnosis. Jonathan was on a mission and worked tirelessly with me in raising funds for the family, creating support systems for the siblings, and visiting the family consistently, almost nightly, for many months at a time. I have known Jonathan to exhibit this same kind of selfless commitment in helping several other educational/social welfare charities.

Jonathan and I reconnected this past June, shortly after Jonathan's realization of how severely his addictions had hijacked his life. Since that time, Jonathan has offered no excuses or rationalizations for his federal crimes of wire fraud and tax crime. Instead, he has exhibited genuine remorse for his actions and sincere concern for those whose lives have been directly and indirectly impacted by his behavior.

Jonathan and I have continued counseling and studying together, and Jonathan has engaged in a steady process of self-reflection, AA meetings, prayer, and study. Jonathan has truly demonstrated a healthy resolve to live a meaningful and purposeful life of contribution.

In my years of working with those afflicted with spiritual ailments, such as addiction, I have come to know that the primary factor that elevates the recovering addict above the fray is his own deep resolve and commitment to personal growth and contribution. I have no doubt that Jonathan will continue to rise well above the fray.

Exhibit H.

Rabbi Shlomo Bistritzky writes:

As Jonathan's Rabbi I have had many hours of conversations with him about his mistakes, and have watched him commit himself to giving back by volunteering to help other with addictions and to help those less fortunate in any way he is capable.

28

DB2/ 31399753.1

1
2
3

Jonathan has lost so much already and yet I know he has so much he can still otter others, I feel very strongly that by extending leniency to him, society will benefit tremendously.

4   Exhibit H.

5

6   Rabbi Yisroel Levine, Director of Development for Chabad of Conejo, writes:

7
8
9

...Jonathan is a polite, mature man with respect to all. He is committed to help our organization in any way possible. He volunteers and does so with a smile. I consider myself a friend of Jonathan.

10
11
12
13
14

I know that Jonathan is being sentenced with respect to a federal crime involving wire fraud and tax crime. I am not here to defend Jonathan on these crimes, but rather to appeal to you, that the person that you are judging is a kind-hearted, sweet, spiritual man that fell into some of life's toughest challenges. I have had numerous conversations with Jonathan recently, and I can attest that Jonathan is working extremely hard on healing, and reforming himself to live a completely ethical and moral life. The changes in him are already evident.

15   Exhibit H.

16
17   Beit T'Shuvah program representatives, Dan Field, LCSW, and Claire

18   McDonald, MFT Trainee (Mr. Schwartz's primary psychotherapist), concluded "it

19   is unlikely that [Jonathan] will return to severe gambling episodes provided that he

20   works a strong recovery program which includes individual psychotherapy,

21   community service and active involvement in Gamblers Anonymous." Exhibit H.

22   Specifically, Mr. Field and Ms. McDonald write:

23
24
25
26

Jonathan Schwartz has a strong understanding of the severity of his gambling addiction and is aware of the devastating impact his actions have had on business associates, friends and family members... *The progress he has made in addressing his severe gambling disorder would be prematurely halted if her were detained or incarcerated*.

27
28

With proper support and ongoing intervention— including paying monetary restitution for his financial misconduct and engaging in critically important family

29

> work to mend the hurt that his actions has caused his children—I feel strongly that Mr. Schwartz will build on the considerable progress he has made while in treatment at our facility.

The over one dozen letters submitted by those who know Mr. Schwartz best reflect his integrity, his ethics, his values, and his devotion to his family and friends.  As he has fully acknowledged, Mr. Schwartz made a significant mistake and fell prey to a wholly uncharacteristic lapse in judgment – a lapse that was in part due, as discussed above, to his compulsive gambling addiction.  Whatever the cause, however, it is beyond dispute that Mr. Schwartz's lapse in judgment represents an aberrant deviation from a lifetime of honesty, integrity, and service to his community.  He seeks now only to put the painful last eight years behind him and to move on as best he can with a life of dignity and integrity.   Mr. Schwartz respectfully asks the Court to consider the letters submitted on his behalf and the totality of his life to place his mistakes in context when determining an appropriate sentence.

e.    ***Sentencing Recommendation by The Aleph Institute***

Mr. Schwartz has been participating in volunteer programs and treatment at The Aleph Institute ("Aleph") in Los Angeles.  Aleph is a not-for-profit, national educational, humanitarian and advocacy organization founded in 1981.  Exhibit I, The Aleph Institute Letter, dated April 21, 2017.  For 36 years, Aleph has focused its work addressing issues relating to the criminal justice system.  Aleph has created and administered programs to counsel and assist offenders and their families with rehabilitation, "ameliorate or reduce necessary periods of incarceration while providing for public safety," and particularly relevant here, "implement and monitor alternative sentencing  protocols."  *Id*. at pg. 1. All of its programs are administered in cooperation with professionals in the criminal justice system at no cost to the government.  *Id*. at pg. 2.  At the heart of Aleph's work is preparing alternative sentencing proposals "designed to mete out appropriate,

30

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

DB2/ 31399753.1

1  substantive punishment with the greatest benefit and lowest cost to society, while

2  redirecting and enhancing an offender's value structure through social, therapeutic

3  and religious counseling and education." *Id*. at pg. 3. Each proposal Aleph

4  submits to the federal courts "carefully considers the factors outlined in 18 U.S.C.

5  § 3553(a), including, but not limited to, "the history and characteristics of the

6  defendant, ..., and the legislative directive to provide, 'correctional treatment in the

7  most effective manner.'" *Id*. at pg. 3, citing 18 U.S.C. § 3553(a)(1)(D). Over the

8  years, Aleph has "worked to assist courts in fashioning a particularized sentence"

9  in "hundreds of varied cases and situations." *Id*.

10  In the instant case, Rabbi Zvi Boyarsky of Aleph has prepared and submitted

11  an alternative sentence proposal for the Court's consideration. *Id*. Rabbi Boyarsky

12  took the time to get to know Mr. Schwartz while Mr. Schwartz has been

13  volunteering at Aleph. Over the course of many in-depth conversations with him,

14  Rabbi Boyarsky concluded, "I have met hundreds, if not thousands, or people who

15  are either in and/or facing prison. Mr. Schwartz's genuine remorse and acceptance

16  of responsibility sticks out as one of the most sincere I've ever witnessed." *Id*. at

17  pg. 10. Rabbi Boyarsky further remarked, "[h]e lost everything, his family, his

18  reputation and his livelihood. He is as close to [ ] humble and [ ] transformed as a

19  human being can get." *Id*. Rabbi Boyarsky also noted that Mr. Schwartz "has

20  been a tireless volunteer for Aleph visiting the elderly and infirm, bringing them

21  food and much needed encouragement."

22  In considering all of the relevant information Rabbi Boyarsky gathered

23  during his evaluation of Mr. Schwartz, including many lengthy  conversations with

24  Mr. Schwartz, review of the character letters written by Mr. Schwartz's family,

25  friends, business associates, medical health care providers, and spiritual leaders,

26  Aleph urges this Court to adopt the following alternative sentence:

27  • 12 months and a day of incarceration;

28  • 12 months of home confinement;

31

DB2/ 31399753.1

- • 3 years of supervised release;
- • 1,000 hours continuation of community service at Bet T'Shuvah and/or other centers that treat addicts and working with youth struggling with addiction;
- • 36-months drug and gambling rehabilitation, in a combination of inpatient and outpatient treatment modalities;
- • Full financial restitution to the insurance company and GSO that paid back his clients;
- • 500 hours mentoring youth struggling with addiction issues;
- • Weekly mentoring by a Rabbi about specific ethical laws and conduct.

*Id*. at pgs. 13-14.

Aleph does not submit such proposals without due consideration of the individual defendant.  Here, Aleph attested that they truly "believe Mr. Schwartz has already demonstrated that his sincere remorse, plus his medical, psychological and family situation warrant it."  *Id*. at pg. 15.  Aleph further submits that its proposal will "give Mr. Schwartz the best possible chance of successful rehabilitation and reintegration...and will also save the government substantial funds that could be better spent elsewhere."  *Id*.  To back up its recommendation, Aleph is committed to "***work with the Probation Office in any way they see fit to monitor and help implement this multi-faceted sentencing program, and submit quarterly reports to the Court, as desired***."  (Emphasis added)  *Id*.

**B.     Nature and Circumstances of the Offense (§ 3553(a)(1))**

Mr. Schwartz has pleaded guilty to one count of wire fraud and one count of subscribing to a false tax return.  He has admitted and accepted full responsibility for the conduct set forth in the Information, attached as Exhibit A to the plea agreement.  *See* Docket No. 6; *See also* Exhibit A.  The recitation of the circumstances of **what** Mr. Schwartz did wrong does not account for the full nature and circumstances of the offenses since such circumstances must include **why** Mr.

32

Schwartz deviated so drastically from an otherwise law-abiding, honest, productive and contributing life to a life as a degenerate gambler, thief and liar, namely, his diagnosed severe gambling disorder.  Once the severe gambling disorder is factored into consideration, the need for a lengthy prison sentence to address the nature and circumstances of the offense lessens.As noted above, a leading post-*Booker* gambling disorder case is *United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014).  In *Dikiara*, the defendant pleaded guilty to mail fraud related to her embezzlement of more than $1 million from her employer.  The defendant utilized her position of trust as office manager responsible for payroll and check writing for the businesses to steal from her boss, at times electing to forge the owner's name on embezzled checks to carry out her scheme.

In sentencing the defendant to 15 months imprisonment, well below the advisory guideline range of 41-51 months, the court engaged in a thoughtful analysis which took into consideration the defendant's gambling addiction.  The court made clear that it was a "serious crime, which went on for over a decade, caused substantial losses, and involved a significant abuse of trust." *Id*. at 1031.  Moreover, "[t]he crime harmed the employer personally, in addition to the other employees of the company, who also lost income." *Id*.

Notwithstanding the seriousness of the crime, the court considered the following factors directly related to the defendant's gambling addiction, which are relevant to the case at bar.

- "[T]he impact of defendant's gambling addiction on her conduct." *Id*. at 1032.

- "Defendant did not act out of a desire to harm her employer, nor did she steal in order to finance a lavish lifestyle." *Id*.

- "Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *Id*., citing *United States v. Hendrickson*, 25 F. Supp. 3d 1166 (N.D. Iowa 2014).

33

1        •    "The [medical expert's] report...indicated that she kept thinking she

2  would eventually win enough to pay back the money she had taken.  This too was

3  consistent with the literature, including the notion of 'chasing one's losses'

4  referenced in the DSM-V." *Id*.

5        •    "[D]efendant's efforts to obtain treatment and rebuild her life after this

6  crime came to light.  A defendant suffering from an addiction or compulsion may

7  be less culpable but, without treatment, may present a greater risk of recidivism if

8  the condition is not addressed." *Id*. at 1033.

9        •    "[D]efendant's lack of any prior record, which bore to some extent on

10  culpability but more on the need to protect the public.  [The court] saw little such

11  need..., given her age, lack of record, progress in treatment, poor health, and strong

12  family support.  Her husband attended GA meetings with her so he could help her

13  avoid problems in the future.  I also considered the fact that she had never served

14  any time before.  Generally speaking, a lesser sentence will suffice to deter a

15  defendant not previously subject to lengthy incarceration than is necessary to deter

16  a defendant who has already served serious time yet continues to re-offend." *Id*.

17        •    "[D]efendant's acceptance of responsibility, admitting the crime to her

18  employer and then the FBI when confronted.  She pleaded guilty to an information

19  and seemed genuinely remorseful." *Id*.

20      Other courts have acknowledged the impact of a gambling disorder in

21  structuring the appropriate sentence for similarly situated defendants.  In *United*

22  *States v. Decrescenzo*, No. 3:14-CR-00230-JBA (D.Ct.), a bank embezzlement

23  case, the court granted a substantial variance from a 15-21 months guideline range

24  to sentence the defendant to one day of imprisonment (that day being when

25  defendant was arrested and processed) followed by supervised release for three

26  years, of which defendant was ordered to serve the first six months in a halfway

27  house, in consideration of the defendant's gambling problem, remorse, prompt

28  acceptance of responsibility, assistance to the Government's investigation and his

1   candor, as well his prompt and continued rehabilitative counseling.  *Id*.  Moreover,

2   the court considered the defendant's collateral punishment including: "loss of

3   marriage, job, elected office and daily life with his small children."  *Id*.  The court

4   also remarked, "[e]ven though his bank embezzlement is a serious crime, it was not

5   motivated by greed, but ***as a result of his gambling problem into which he now***

6   ***shows good insight***."  *Id*. (emphasis added).

7        The facts of both *Dikiara* and *Decrescenzo* are similar to the instant matter

8   and justify a similar significantly reduced sentence based on Mr. Schwartz's

9   similar severe gambling disorder, as diagnosed by Dr. Potenza.

10        Here, the impact of Mr. Schwartz's gambling disorder on his criminal

11   conduct is indisputable.  As Dr. Potenza concluded, "[Mr. Schwartz's] criminal

12   activity to support his gambling would be consistent with a severe form of the

13   disorder."  Potenza Report ¶ 36.  Further, Dr. Potenza concluded, "Mr. Schwartz,

14   like many similar individuals suffering from a severe gambling addiction, did not

15   rationally weigh the costs of his actions of stealing from his clients and not paying

16   taxes on the stolen funds but appeared to act impulsively without appropriate

17   forethought being given to the future ramifications of his actions."  *Id*. ¶ 37.

18        Like the defendant in *Dikiara*, Mr. Schwartz did not rationally assess the

19   costs of his actions and instead acted impulsively without accurately weighing

20   future consequences.  As he returned to gambling to cope with his stress at work,

21   his bets started to increase from "$300 to $1,000 per bet, being made at all times of

22   the day and funded beyond his compensation from work."  Potenza Report, ¶ 29C.

23   Despite his substantial income, Mr. Schwartz irrationally and without weighing the

24   consequences of his actions began asking family members for money to fund his

25   gambling.  *Id.*; PSR ¶ 28, 89.  And as his "gambling started to interfere with his

26   work and home life, he had to lie to everyone close to him about his gambling and

27   the extent of his gambling."  Potenza Report, ¶ 29C.  Eventually he began stealing

28   from his clients to fund his gambling.  *Id*.  Then as his gambling losses mounted,

35

DB2/ 31399753.1

he "stole more and more cash from his clients without their knowledge or authorization to try to win the money back unsuccessfully." *Id*. Mr. Schwartz had a client roster filled with celebrities, a beautiful family, a high-profile job, yet he irrationally stole from his clients to continue chasing his gambling losses. This irrational impulsivity was confirmed by at least one of the tests administered by Dr. Potenza. Mr. Schwartz's score of 82 on the Barratt Impulsiveness Scale is "higher than we typically see in healthy control subjects" where the average scores are 54.5. *Id*. ¶ 37. Based on this abnormally high score, Dr. Potenza concluded, "[h]is high level of impulsivity is consistent with his addictive tendencies, including with respect to gambling." *Id*.

In *Dikiara*, the court relied on the medical expert's report in sentencing the defendant to 15 months imprisonment, well below the advisory guideline range of 41-51 months. The medical report in *Dikiara* indicated the defendant "kept thinking she would eventually win enough to pay back the money she had taken." Similarly here, Dr. Potenza concluded that "Mr. Schwartz's belief over the years that he could win back his money by continuing to make sports bets and hoping that his luck would turn around is consistent with the criteria in the DSM-5 for a gambling disorder involved with 'chasing one's losses.'" *Id*. ¶ 36. Dr. Potenza observed:

> [H]e stole more and more cash from his clients without their knowledge or authorization ***to try to win the money back unsuccessfully.*** He lied to his partners, his clients, and everyone around him to try to hide his gambling activities. Rather than being able to stop and admit his wrongdoing, Mr. Schwartz continued for years increasing his bets, his losses, his lies and his thefts.

*Id*. ¶ 29C (emphasis added). Mr. Schwartz explains that he "'borrowed' a little from clients, with the hopes that I would pay them back if I won that night's bet." He continues, "[t]hat snowballed and as I kept losing, I kept stealing. I kept telling myself that I just needed one lucky break, and I'll pay them back." Exhibit A. Mr. Schwartz thought he "could somehow survive until the next bet which became

36

bigger and bigger hoping to have it all paid off at some point. An utter fantasy fueled by [his] addiction." *Id*.

Like the defendant in *Dikiara*, Mr. Schwartz did not act out of a desire to harm his clients or his employer, nor did he steal to finance a lavish lifestyle. He did not need the money to fund a lavish lifestyle as he already had already had substantial income. As discussed above, Mr. Schwartz was caught in the downward spiral of his gambling addiction. He readily admits now that he "should have reached out to his [clients, partners or employees] for help." *Id*. He "knew they would have helped [him], but [he] feared them being disappointed and justifiably angry at [him]." Mr. Schwartz's criminal conduct simply had no connection to any intention of hurting his victims.

And similar to *Dikiara*, Mr. Schwartz lacks any prior criminal record and has made substantial efforts to obtain treatment to rebuild his life since his crime has come to light. PSR ¶ ¶ 54-61, 79. In fact, Mr. Schwartz has explained that he is thankful that his crime came to light because it forced him to face up to his gambling problem. In his public apology published in the Hollywood Reporter, Mr. Schwartz described why he was thankful. "I say thankfully because when I was finally caught, a bright spotlight shined on my deplorable conduct. I could not hide any longer and hit rock bottom. By seeing how pathetic I had become, I finally got the courage to ask for help." *See* Exhibit C.

Within a month from the time his crime came to light, Mr. Schwartz began the 90 day Out Patient Program for Problem Gambling at the Beit T'Shuvah Residential Treatment Center. PSR ¶ 79; Exhibit J, Letter from Janet L. Markowitz, Sr. Alternative Sentencing Associate at Beit T'Shuvah; Potenza Report ¶ 28D. His treatment includes group and individual therapy, 12-step recovery and classes in Jewish ethical and spiritual values. Mr. Schwartz continues to attend Gamblers Anonymous and Alcoholics Anonymous meetings 3-4 per week and has been sober for 340 days as of the filing of this memorandum. PSR ¶ 28(a) – (f).

37

As discussed above, Mr. Schwartz also spends time volunteering at Aleph and teaches a class at Beit T' Shuvah to motivate the residents on positive thinking and using the 12 steps and other important tools he learned in the program.

Also similar to *Dikiara*, Mr. Schwartz has fully accepted responsibility for his criminal conduct. This was acknowledged by the Probation Officer in her recommendation for a downward adjustment based on acceptance of responsibility, and where she remarked, "Schwartz expressed remorse for his conduct in the instant matter. He has lost everything..." PSR ¶ 28(e).

This matter also involves facts similar to *Decrescenzo*. In *Decrescenzo*, the Court departed from a guidelines range of 15 to 21 months in favor of a sentence of one day imprisonment (that day being when defendant was arrested and processed) followed by supervised release for three years, of which defendant was ordered to serve the first six months in a halfway house and to participate in a treatment program for compulsive gambling. As discussed above, the court in that case considered the defendant's self-inflicted substantial losses relating to the criminal conduct stemming from defendant Decrescenzo's gambling addiction. This included: "loss of marriage, job, elected office and daily life with his small children." *Id*. Like here, these were all "*as a result of his gambling problem into which he now shows good insight*." (Emphasis added) *Id*.

Like the defendant in *Decrescenzo*, Mr. Schwartz has lost "everything that meant anything to" him. Exhibit A. As discussed above, Mr. Schwartz has lost his marriage, his family, his job, and any ability to earn a living in the future. Mr. Schwartz brought these losses upon himself; but it is impossible to divorce his criminal conduct from his gambling addiction. Just as the courts in *Dikiara* and *Descrescenzo* took into account the very salient circumstance of those defendants' gambling addictions in sentencing them well below their respective guideline ranges, so too should this Court consider Mr. Schwartz severe gambling disorder in determining his sentence.

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

1

**C.    The Need for the Sentence Imposed to:**

2

3

    1.    <u>Reflect the seriousness of the offense, promote respect for the
law and provide just punishment (§ 3553(a)(2)(A))</u>

4        Mr. Schwartz fully agrees that the offenses he committed are serious.  As

5    discussed above, however, the facts and circumstances of his gambling addiction

6    serve as mitigating factors this Court should consider in articulating a sentence that

7    reflects the seriousness of the offense, promotes respect for the law and provides

8    just punishment.

9        With respect to just punishment, Mr. Schwartz has already paid, and will

10    continue to pay, a substantial price for his transgressions.  Between the substantial

11    restitution amount, tax liabilities and 75% civil fraud penalties for 2010 through

12    2014, totaling over $8,700,000, the monetary penalties are sufficiently high enough

13    to reflect the seriousness of the offense, promote respect for the law and provide

14    punishment.

15        Moreover, as set forth in his letter to the Court, Mr. Schwartz has lost

16    everything: the Colorado Board of Accountancy has commenced the license

17    revocation procedure and Mr. Schwartz will thus be unable to work in his chosen

18    profession, his marriage has ended, his family unit has been devastated, and he has

19    completely destroyed his reputation in the business community.  In light of these

20    severe financial and other penalties, and taking into consideration his personal

21    background and his full acceptance of responsibility, a sentence greater than 12

22    months and one day, 12 months home detention and 2,000 hours of community

23    service is not necessary to provide additional punishment for Mr. Schwartz's

24    offenses under § 3553(a)(2)(B).

25

    2.    <u>Afford adequate deterrence to criminal conduct
(§ 3553(a)(2)(B))</u>

26

27        The sentence imposed by the Court should also be sufficient, but not greater

28    than necessary, to adequately deter criminal conduct.  18 U.S.C. § 3553(a)(2)(B).

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

DB2/ 31399753.1

Undoubtedly, the goals of specific and general deterrence have already been met in this case.

Given Mr. Schwartz's acceptance of responsibility and the extraordinary steps he has taken to inform the public of his transgressions, an extended prison sentence is not necessary to achieve specific or general deterrence.  With respect to specific deterrence, Mr. Schwartz' lack of criminal history coupled with his forthright acknowledgement of his crimes and his demonstrated commitment to address his addictions amply establishes that a lengthy sentence of imprisonment is not needed to ensure that Mr. Schwartz does not re-offend.  That message has been received very loudly and very clearly.

With respect to general deterrence, in the typical case general deterrence is mainly achieved by the government publicizing and media reporting on a lengthy sentence; otherwise, the public hears little of what went on in court.  In contrast, in this case Mr. Schwartz has proactively taken a very significant and unusual step to publicize his crimes and the circumstances behind them in order to deter others from following in his disastrous footsteps.  On April 11, 2017, Mr. Schwartz published an open letter in the Hollywood Reporter apologizing to his community, victims, and family.  Since publication of his letter, the Hollywood Reporter has informed Mr. Schwartz that the letter has been viewed over 20,000 times in various social media outlets including at the Hollywood Reporter, Yahoo, Los Angeles Times, Spin, and Billboard.

In his open letter to the community, Mr. Schwartz genuinely expressed his remorse by admitting his crimes and warning others not to follow in his errant path.  He wrote:

> I am writing this open letter to you so that you can learn from my mistakes and never find yourself in the situation I am now in.  I am a convicted felon who has fully accepted responsibility and pleaded guilty to federal charges related to my embezzling over $7 million from my clients and business partners over a six-year period.

40

...Part of my amends include making sure that others who might be in my former situation, in super stressful jobs where the demands feel overwhelming, do not turn to drugs or gambling to deal with the stress or violate their responsibilities to others hoping no one will notice, but seek help from those around them or treatment before it is too late. ***Please use me as an example of what can go disastrously wrong when you start down the wrong path. Please follow a different path***.

Exhibit C.

In addition to the April 11, 2017 open letter Mr. Schwartz wrote, his legal troubles have received widespread publicity since May 2016, promoting general deterrence and lessening the need for a lengthy sentence to send the deterrent message to the public. On May 17, 2016, the Hollywood Reporter published on its website a story entitled, "Alanis Morissette Claims Ex-Business Manager Stole $4.7M." Ashely Cullins, Hollywood Reporter (May 17, 2016, 4:30 PM), Alanis Morrissette Claims Ex-Business Manager Stole $4.7 M, http://www.hollywoodreporter.com/thr-esq/alanis-morissette-claims-business-manager-895175. A more recent Google search using the search terms "Jonathan Schwartz business manager fraud" revealed over 370,000 results.

Thus, in light of the publicity surrounding deterrence that has already been achieved and the circumstances surrounding the offenses, a lengthy prison sentence is not necessary to achieve general deterrence. Any person contemplating embezzling money from clients and not reporting it on their tax returns who hears that Mr. Schwartz has lost his family, his job, his wealth, his reputation, and his professional license, will be obligated to pay back all the restitution, taxes and huge penalties, and will be a convicted felon for the rest of their life will be adequately deterred without also needing to have a lengthy sentence of incarceration added into the mix. At the same time, a non-lengthy sentence of incarceration, home detention and community service would signal and reaffirm the longstanding principle that those who very timely accept responsibility and

41

DB2/ 31399753.1

take steps to correct their conduct and address their addictions will not be treated as severely as those who fail to take those measures.  Moreover, the government's own study demonstrates that a lengthy sentence of incarceration is not required to promote general deterrence. An empirical analysis of the effect of different sentences on taxpayer compliance, which was funded in part by the IRS, failed to find a difference between convictions that resulted in probation and convictions that resulted in prison; both deterred tax crimes. It did find, however, that convictions resulting only in fines (*i.e.*, in neither prison nor probation) led to lower compliance. *See* Jeffrey A. Dubin, *Criminal Investigation Enforcement Activities and Taxpayer Noncompliance*, 2004 IRS Research Conference (June 2004) (http://www.irs.gov/pub/irs-soi/04dubin.pdf).

Accordingly, specific and general deterrence in this case do not militate in favor of a lengthy sentence of imprisonment.

3.    <u>Protect the public from future crimes of the defendant (§ 3553(a)(2)(C))</u>

Mr. Schwartz has no prior arrests or convictions and a previously unblemished lifelong record of honesty and integrity.  Furthermore, he has demonstrated full acceptance of responsibility and extraordinary remorse for the offenses that he committed.  There is absolutely no basis to suggest that his incarceration is necessary to protect the public.

4.    <u>Provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner (§ 3553(a)(2)(D))</u>

There is no need to provide Mr. Schwartz with any educational or vocational training or other correctional treatment.  As for medical care, as discussed above, it is clear that the most effective treatment for Mr. Schwartz' gambling and drug addiction can only be provided **outside** of the BOP system.  In his report, Dr. Potenza concluded, Mr. Schwartz's "ability to self-assess and self-realize the very negative effects his severe gambling disorder have had on all aspects of his life

42

bodes well toward his ability to maintain his abstinence, ***provided he continues his hard work, effort and commitment towards maintaining his abstinence***." (Emphasis added)  Potenza Report ¶ 39.  Indeed, Beit T'Shuvah program representatives, Dan Field, LCSW, and Claire McDonald, MFT Trainee (Mr. Schwartz's primary psychotherapist), who have treated Mr. Schwartz for the last 10 months, state that "[t]he progress he has made in addressing his severe gambling disorder will be prematurely halted if he were detained or incarcerated." Exhibit H.

A short period of incarceration followed by continued treatment is the most appropriate sentence under the circumstances.

### D.   The Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6))

The goal of avoiding unwarranted sentencing disparities, which was a principal motivating force for the Sentencing Guidelines, remains a key sentencing factor under 18 U.S.C. § 3553.  *See United States v. Ressam,* 679 F.3d 1069, 1094 (9th Cir. 2012); *see also* 28 U.S.C. § 991(b)(1)(B) (purposes of Sentencing Commission include "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices").  In this case, a below-guidelines sentence is required to avoid unwarranted disparities with sentences imposed on defendants guilty of similar or more egregious misconduct.

While the defense acknowledges that each case presents its unique factual issues, the below cases all involved defendants whose criminal conduct was related to their gambling addiction.  Moreover, the cases generally involved embezzlement, theft or fraud, and substantial sums of money.  Most importantly, the cases all involved the imposition of below-guidelines (and often substantially

43

DB2/ 31399753.1

below-guidelines) sentences due, in whole, or in part, to the defendants' gambling addictions. Accordingly, this sentencing factor weighs strongly in favor of Mr. Schwartz receiving a similar downward variance to a blended sentence of 12 months and 1 day of incarceration followed by 12 months of home detention and 2,000 hours of community service.

In *Decrescenzo*, the defendant, a former West Haven, Connecticut city councilman, pleaded guilty to one count of wire fraud involving embezzlement from his clients where he worked as a personal banker. The defendant stole money directly from his clients' bank accounts in order to support his gambling addiction. The advisory guidelines range was 15-21 months. In rendering judgment, the court cited the defendant's gambling problem and outlined the basis for a substantial departure from a guidelines range sentence:

> His remorse was immediate and palpable, as manifested by his prompt acceptance, his assistance to the Government's investigation and his candor, as well his prompt and continued rehabilitative counseling.
>
> While all defendants suffer consequences from the prosecution process, Mr. DeCrescenzo's losses have been substantial: loss of marriage, job, elected office and daily life with his small children. Even though his bank embezzlement is a serious crime, it was not motivated by greed, ***but as a result of his gambling problem into which he now shows good insight.***

(Emphasis added) Judgment, *United States v. Decrescenzo*, No. 3:14-CR-00230-JBA (D.Ct. Feb. 23, 2015), ECF No. 19. The defendant was sentenced to **one day imprisonment** (that day being when defendant was arrested and processed) followed by supervised release for three years, of which defendant was ordered to serve the first six months in a halfway house and to participate in a treatment program for compulsive gambling.

In *United States v. Andrew Caspersen*, No. 16-cr-00414-JSR (SDNY), the defendant pleaded guilty to one count of wire fraud and one count of securities fraud for what the government described in its sentencing memorandum as

44

1    engaging in a "Ponzi-like scheme to defraud more than a dozen investors,

2    including his close friends, family members, and college classmates" out of over

3    $38 million through the use of a sophisticated web of shell company bank accounts

4    (approximately **5 times** the amount involved in this case, *see* PSR ¶ 20).  Taking

5    into consideration defendant's severe gambling disorder diagnosis, the defendant

6    was sentenced to **forty eight months imprisonment** despite a guidelines range of

7    151-188 months.

8         In *Dikiara*, the defendant pleaded guilty to mail fraud related to her

9    embezzlement of more than $1 million from her employer.  The defendant utilized

10   her position of trust as office manager responsible for payroll and check writing for

11   the businesses to steal from her boss, at times electing to forge the owner's name

12   on embezzled checks to carry out her scheme.  The advisory guideline range was

13   41-51 months.  Taking into consideration the defendant's gambling addiction, the

14   fact that she did not act out of a desire to harm her employer, nor did she steal in

15   order to finance a lavish lifestyle, and the defendant's efforts to obtain treatment

16   for her gambling addiction and rebuild her life, the defendant was sentenced to

17   **fifteen months imprisonment**.

18        In *United States v. Peterson*, 363 F.Supp.2d 1060 (E.D. Wis.), the defendant

19   pleaded guilty to bank fraud arising out of a scheme he devised to steal over

20   $80,000 from his employer, including ensnaring his sister without her knowledge

21   into the scheme by forging her signature and depositing checks into her bank

22   account.  The advisory guideline range was 12-18 months.  Acknowledging the

23   serious abuse of trust, and his involvement of his sister without her knowledge to

24   carry out his scheme, the court took into consideration the defendant's gambling

25   addiction and the need for the defendant to continue counseling and to attend

26   Gambler's Anonymous meetings in imposing a sentence of **one day of**

27   **imprisonment followed by five years of supervised release**.

28

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

### E.    The Need to Provide Restitution to Victims of the Offense (§ 3553(a)(7))

As discussed above, Mr. Schwartz has accepted the probation officer's calculation of restitution and is making his best efforts to settle with his victims. For instance, he has resolved a civil law suit with one of his victims and is in the process of resolving a lawsuit by his former employer, GSO. There is no need for incarceration to achieve the goal of restitution. Indeed, a lengthy imprisonment sentence would militate against efforts for Mr. Schwartz to earn money to repay his victims.

### III.    CONCLUSION

In sentencing Mr. Schwartz and balancing the factors under Section 3553(a) to determine a sentence sufficient but not greater than necessary to achieve the aims of sentencing, the Court has a difficult job. On the one hand, Mr. Schwartz's crimes are serious, involved millions of dollars and occurred over a number of years; moreover, his deceitful and fraudulent actions caused significant financial and reputational harm to his clients, partners, and employees. On the other hand, this misconduct from someone who otherwise led a law-abiding, hard-working, productive, caring and charitable life with a great family, job, position in the community and lifestyle only makes sense when one understands what drove Mr. Schwartz to throw his life all away -- his severe gambling disorder. That severe gambling disorder does not excuse but greatly helps to explain why Mr. Schwartz did what did. When Mr. Schwartz finally addressed that gambling disorder and related drug use in May 2016, the Court is able to see the kind of person Mr. Schwartz was and can be again, a person who fully accepts responsibility for his actions, gets intense treatment to deal with his addictions, enters into a pre-indictment plea agreement and IRS closing agreements, pleads guilty to all the crimes charged, gives up his CPA license, proactively writes an open letter to the community so people can learn from his mistakes, gets more involved with

46

charitable work to help others, and works every day on the long and difficult path to regaining the respect and trust of his family, friends, and community.  The sentence the Court orders will be in addition to the lifelong sentence of shame Mr. Schwartz will suffer because of his actions.  A sentence of 12 months and a day of prison, 12 months home detention and 2,000 hours of community service coupled with a restitution of over $8.7 million -- in addition to the punishments of losing one's family, job, clients, assets, reputation, and professional license -- will manifestly deter anyone thinking of committing Mr. Schwartz's crimes that the ramifications of doing so are extremely dire.  A lengthy prison sentence is not necessary to achieve this additional deterrence.

As Mr. Schwartz has written to the Court:

> I make no excuses for my incredibly stupid and destructive misconduct: I violated the trust of my clients and partners that I had worked years to build; I lied repeatedly to people who mattered most to me and counted on me; I broke the law by stealing from my clients and not paying my taxes; I basically threw away my life, my marriage, my reputation in the business and charitable communities, any respect people may have had for me, and really anything that meant anything for me.  I alone am responsible for the devastation I have caused to everyone involved and I cannot begin to apologize enough to them and tell them how truly sorry I am for my actions.  The enormous shame and complete disappointment I have in myself will be something I have to live with the rest of my life.

> ...My shame and disappoint[ment] in myself for all the hurt I have caused my family, clients, business partners, employees, peers and friends confronts me every day and will be something I will deal with the rest of my life.  I had a fiduciary responsibility to serve my clients, and I violated that trust. I had a parental responsibility to be a father my three boys could be proud of and admire.  I failed to live up to those responsibilities.  I let everybody down -- my wife has left me, my partners and clients have fired me, my sons won't even speak with me, my CPA license and assets are gone, my career is over, and my name and reputation, which used to be something I could take pride in, now equate to thief and convicted felon.  My mother is battling lung and brain cancer, and I want to be there for her, but know that I may not.

47

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG

For my actions, I will spend the rest of my life asking for forgiveness. I have destroyed the relationships that matter most to me, and I have only myself to blame.

...I thank Your Honor very much for the time and effort you have put into my case. I know that I am asking a lot of Your Honor to consider a sentence much lower than the sentencing guideline range but if you will give me one chance -- one chance -- there will not be a moment in any day going forward when I will not work as hard as I possibly can to make you proud of giving me that one chance. It is my solemn promise to this Court that I will never again commit a crime and will live a life as a contributing, productive, honest citizen, father and community member.

Exhibit A.

For the reasons set forth herein, and taking into consideration the nature and circumstances of the offense, Mr. Schwartz's history and personal characteristics, and all of the goals of sentencing enumerated in § 3553(a)(2), Mr. Schwartz respectfully requests a sentence of 12 months and a day of imprisonment, 12 months of home detention, and 2,000 hours of community service.

DATED:  April 26, 2017

Morgan, Lewis & Bockius LLP

By:____/s/ Nathan J. Hochman_____
Nathan J. Hochman
Attorneys for Defendant
Jonathan Schwartz

48

DB2/ 31399753.1

## **DECLARATION OF NATHAN J. HOCHMAN**

I, Nathan J. Hochman, declare as follows:

1.     I am an attorney duly licensed to practice law in the Central District of California, and I am counsel for defendant Jonathan Schwartz in this case.  I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.     Attached hereto as Exhibit A is a true and correct copy of a letter from Mr. Schwartz to the Court.

3.     Attached hereto as Exhibit B is a true and correct copy of an analysis of the telephone calls between Jonathan Schwartz and his bookie between 2009 and 2015 derived from the Verizon telephone bills.

4.     Attached hereto as Exhibit C is a true and correct copy of Jonathan T. Schwartz Letter, published at the Hollywood Reporter, on April 11, 2017.

5.     Attached hereto as Exhibit D is a true and correct copy of Report on the Gambling Disorder of Jonathan Schwartz, authored by Dr. Marc Potenza.

6.     Attached hereto as Exhibit E is a true and correct copy of a character letter submitted to the Court by his mother, Joyce Schwartz.

7.     Attached hereto as Exhibit F are true and correct copies of a series of character letters submitted to the Court by friends of Mr. Schwartz.

8.     Attached hereto as Exhibit G is a true and correct copies of a character letter submitted to the Court by a former employee of Mr. Schwartz.

9.     Attached hereto as Exhibit H are true and correct copies of a series of character letters submitted to the Court by mental health care providers and clergy on behalf of Mr. Schwartz.

10.     Attached hereto as Exhibit I is a true and correct copy of a sentencing recommendation submitted to the Court by the Aleph Institute on behalf of Mr. Schwartz.

11.     Attached hereto as Exhibit J is a true and correct copy of a character

49

**DECLARATION OF NATHAN J. HOCHMAN**

letter submitted to the Court by Janet L. Markowitz, Sr. Alternative Sentencing Associate at Beit T'Shuvah.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my information and belief.

Executed this 26th day of April 2017, at Santa Monica, California.


*/s/ Nathan J. Hochman*
Nathan J. Hochman

JONATHAN T. SCHWARTZ'S SENTENCING POSITION CR 17-00022-DMG