SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Chief Assistant for Trials, Integrity & Professionalism
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2432
    Facsimile: (213) 894-0141
    E-mail:    ranee.katzenstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>JONATHAN TODD SCHWARTZ,<br><br>          Defendant. | No. CR 17-22-DMG<br><br>GOVERNMENT'S REPLY TO DEFENDANT'S POSITION RE SENTENCING; EXHIBITS<br><br>Hearing Date: May 3, 2017<br>Hearing Time: 4:30 p.m.<br>Location:     Courtroom of the<br>              Hon. Dolly M. Gee |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Ranee A. Katzenstein, hereby files its Reply to Defendant's Position re Sentencing.

This Reply is based upon the attached memorandum of points and authorities; the attached exhibits; the file and record in this case including the government's Position re Sentencing and exhibits

///

///

1  thereto, which was previously filed on August 19, 2017 (CR 22); and

2  such further evidence and argument as the Court may permit.

3   Dated: May 1, 2017          Respectfully submitted,

4                               SANDRA R. BROWN
                                Acting United States Attorney
5
                                LAWRENCE S. MIDDLETON
6                               Assistant United States Attorney
                                Chief, Criminal Division
7

8                                    /s/ *Ranee A. Katzenstein*
                                RANEE A. KATZENSTEIN
9                               Assistant United States Attorney
                                Chief Assistant for Trials, Integrity &
10                              Professionalism

11                              Attorneys for Plaintiff
                                UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    Introduction.................................................1

II.   A Correct Analysis of the § 3553(a) Factors Supports The
      63-Month Sentence Called for by the Sentencing Guidelines
      and Recommended by The Probation Office.......................3

      A.    Defendant presents no evidence showing that he gambled
            with the money he stole................................3

      B.    Defendant Did Not "Reveal, Reform, and Rehabilitate"
            When His Thefts Were Discovered.........................8

      C.    A Significant Sentence Is Necessary to Achieve General
            Deterrence.............................................10

      D.    A Within-Guidelines Sentence Will Avoid Sentencing
            Disparity, Not Create it as Defendant Contends.........11

      E.    The "Substantial Price" Defendant Contends he has
            already Paid for his Crimes Is the Natural Consequence
            of His Own Actions and Does Not Amount to the Just
            Punishment Contemplated by § 3553(a)...................14

III.  CONCLUSION..................................................14

EXHIBITS  ......................................................17

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                          <u>PAGE</u>

CASES

<u>United States v. Caspersen</u>,
    CR 16-414-JSR (S.D.N.Y) ....................................13

<u>United States v. Decresenzo</u>,
    CR 14-230-JBA (D. Conn.) ...................................13

<u>United States v. Dikaria</u>,
    50 F. Supp. 3d 1029 (E.D. Wis. 2014) .......................13

<u>United States v. Genis</u>,
    CR 16-509-DSF (C.D. Cal.) ..................................12

<u>United States v. Lee</u>,
    CR 15-01-DOC (C.D. Cal.) ...................................12

<u>United States v. Peterson</u>,
    363 F. Supp. 2d 1060 (E.D. Wis. 2005) ......................13

<u>United States v. Ransdell</u>,
    CR 13-680-GW (C.D. Cal.) ...................................12

<u>United States v. Ruderman</u>,
    CR 09-757-JFW(C.D. Cal.) ...................................12

STATUTES

18 U.S.C. § 3624(c) ............................................11

18 U.S.C § 3663(a) .........................................passim

ii

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   Introduction

In his Position re Sentencing ("Def. Pos.") defendant JONATHAN TODD SCHWARTZ ("defendant") repeatedly states that he "makes no excuses" for stealing over $7 million from his clients, bringing a 30-year-old business to the brink of ruin, and causing some 12 employees of that business to lose their jobs.  (E.g., Def. Pos. 13, 47.)  In fact, defendant's sentencing position is premised on and permeated by an excuse, namely that he committed his crimes because he was suffering from a gambling disorder.  But defendant provides no evidence — not a single casino receipt or I.O.U. — to show that he used the money he stole for gambling.  His only showing is his own statements, repackaged into an expert report that he commissioned, which concludes without any independent evidence that defendant had a gambling disorder.  Defendant wants the Court to take the further inferential step, also entirely unsupported by any evidence, that, in order to have money to wager, defendant — who was earning $1.2 million a year from his job — was compelled by this "disorder" to steal millions more from his clients.

In support of these unsubstantiated claims, defendant relies of a report that he commissioned from Dr. Mark Potenza.  The "Clinical Evaluation" of defendant in this report is based almost exclusively on defendant's own unverified and uncorroborated statements.  Dr. Potenza takes these statements at face value notwithstanding the fact that they were made in the context of preparing a document to be submitted to the Court in support of defendant's request for a reduced sentence.  Moreover, nothing in the report shows that, even if defendant gambled, he used the money he stole for that purpose

rather than to fund his high-end lifestyle, or that he was unable to stop gambling if he so chose.  Defendant was a sophisticated, fully functioning adult in complete possession of his faculties, but he never asked for help to stop his allegedly problematic gambling, even though he was surrounded by friends and family, and readily asked for professional help for other problems.

Defendant's analysis of the § 3553(a) sentencing factors is profoundly flawed.  He all but ignores the sentencing guidelines, which call for an advisory sentencing range of 63-78 months.  His discussion of defendant's history and characteristics is wrong. Defendant did not "reveal, reform, and rehabilitate" as soon as his crimes were discovered; he lied, blamed others, and left it to his former colleagues at GSO to clean up the mess he left in his wake. He did not acknowledge that he'd committed a crime until after the government had put together its case and he had no other choice. Defendant's analysis of deterrence is also wrong.  The statutory goal of deterrence is not advanced by the guest column defendant posted on the Hollywood Reporter website on the eve of sentencing; deterrence will be advanced by a significant sentence for defendant's egregious crimes.

Defendant's victims — real people who suffered significant harms — look to this Court for justice.  The statutory goals of just punishment and deterrence call for a sentence far in excess of the year-and-a-day sentence defendant requests.  The Court should decline his request for a 13-level variance to cut his advisory guidelines sentence by 80%, and impose the 63-month low-end Guidelines sentence recommended by the Probation Officer and supported by all the facts of this case.

1    **II.  A Correct Analysis of the § 3553(a) Factors Supports The
          63-Month Sentence Called for by the Sentencing Guidelines and
2         Recommended by The Probation Office**

3        **A.  Defendant presents no evidence showing that he gambled with
              the money he stole**

4

5        Defendant claims that his crimes were the "result of his

6    pathological gambling addiction."  (Def. Pos. 3.)  Defendant presents

7    no evidence showing that he used the money he stole to gamble.  He

8    merely asserts that he had a gambling disorder and hopes the Court

9    will infer that he used the money he stole to fund his bets.  But

10   defendant's showing of a gambling disorder itself doesn't hold up.

11       Defendant relies on Dr. Potenza's report (Def. Pos. Exh. D

12   ["Report"]) to establish his gambling disorder.  Although 34 pages in

13   length, the Report discusses defendant himself only in the six-and-a-

14   half-page-long "Clinical Evaluation" section.  (Report ¶¶ 27-41.)

15   This section is based almost exclusively on defendant's own,

16   uncorroborated and unverified statements.  Indeed, it appears Dr.

17   Potenza did not even review any financial records to independently

18   establish that defendant did, in fact, gamble.  Because Dr. Potenza

19   used unreliable sources as the basis for his Clinical Evaluation, his

20   conclusions, which defendant quotes extensively (<u>e.g.</u>, Def. Pos. 14-

21   20, 35-37, 42-43), are not reliable.[1]

22       Dr. Potenza identifies the bases for his "Clinical Evaluation"

23   as follows: (1) a clinical interview of defendant lasting

24   _____

25       [1] The government requested other materials from defendant to
     assist it and the Court in evaluating Dr. Potenza's conclusions and
26   determining whether they provide a reliable basis on which to rest a
     sentencing decision.  For example, the government asked defendant how
27   much he paid Dr. Potenza to prepare the Report, and for information
     about the number of times Dr. Potenza has previously provided a
28   gambling addiction diagnosis to other criminal defendants. Defendant
     refused to provide this information.  (<u>See</u> Exh. F attached hereto.)

                                        3

1   approximately three hours; (2) three self-report tests, _i.e._, tests

2   that defendant filled out himself; (3) an analysis of defendant's

3   phone calls (Def. Pos. Exh. B); and (4) letters submitted in

4   connection with the up-coming sentencing (Def. Pos. Exhs. E-H).

5   (Report ¶ 27.)  These bases are unreliable because, as explained

6   below, they comprise little more than defendant's own self-serving

7   statements.

8       Clinical interview:  Dr. Potenza conducted a single interview of

9   defendant.  Dr. Potenza states that it lasted "approximately three

10  hours" (possibly even less because defendant may have used part of

11  the time to fill out the "self-report" tests discussed below).  (See

12  Report ¶ 27.)  Dr. Potenza took all of defendant's statements at _face

13  value_ and did nothing to verify or corroborate any of the facts that

14  defendant self-reported.  Dr. Potenza did not interview any family

15  members, friends or business associates of defendant to provide

16  perspective on defendant's own, subjective statements.  Nor did Dr.

17  Potenza obtain and review records from defendant's prior mental

18  health treatments.  (See Report ¶ 30.)  Nor did Dr. Potenza review

19  any financial records to verify defendant's own account of the extent

20  of his gambling and the impact of his gambling on his finances.  (See

21  Report ¶¶ 29(c), 36.)

22      This failure to verify and/or corroborate defendant's own

23  statements is significant because defendant's statements were being

24  offered in connection with the preparation of a report that defendant

25  would be submitting to the Court to bolster his request for a below-

26  guidelines sentence based on an asserted "gambling disorder."  Dr.

27  Potenza's Report does not consider the context in which the

28

4

statements were made and the implications of that context for the statements' trustworthiness.

Self-report Tests:  The Report recounts and relies on the results of three "self-report instruments" filled out by defendant: (a) the South Oaks Gambling Screen; (b) the Barratt Impulsivity Scale; and (c) the Toronto Alexithymia Scale.  (Report ¶¶ 27, 34-37.) Defense counsel also relies on these results to support his sentencing recommendation.  (Def. Pos. 17-18, 36.)

The tests that purportedly undergird Dr. Potenza's conclusions are multiple-choice questionnaires that defendant completed.[2]  Once again, Dr. Potenza simply took the answers provided by defendant at face value.  Dr. Potenza's Report nowhere considers the possibility that defendant exaggerated or skewed his answers on these questionnaires to ensure a gambling disorder "diagnosis" that could be used to justify his request for a reduced sentence.

Also significant are the tests that Dr. Potenza did not administer.  The Report includes a general overview of pathological gambling that describes a "biological component" of gambling disorders.  Among other factors, this section discusses the effects on the neurotransmitters serotonin, dopamine, norepinephrine, and opioids.  (Report ¶ 20.)  But Dr. Potenza did not conduct any tests regarding defendant's neurotransmitters or the existence of any other "biological determinants of pathological gambling." (Id.).

---

[2] The questions on the Toronto Alexithymia Scale address general emotions ("alexithymia" refers to emotional blindness) and are not specific to gambling.  The questions on the Barratt Impulsiveness Scale, which is designed to measure a person's level of impulsiveness, also do not refer to gambling.  Copies of these tests, as well as the South Oaks Gambling Screen, which were obtained from the internet, are attached hereto as Exhibit G for the Court's reference.

1    <u>Phone Call Analysis</u>:

2    Dr. Potenza recites and relies on information provided to him in

3    an "analysis" of defendant's phone bills that purportedly reflect

4    calls to a "person reportedly placing bets for him (his bookie, Mr.

5    David Corsello)." (Report ¶ 36.) The information is a tally of

6    calls to certain phone numbers. (Def. Pos. Exh. B.) Dr. Potenza has

7    no independent information that the phone numbers to which the calls

8    the being tallied were placed actually belonged to David Corsello, or

9    – more importantly – that David Corsello was defendant's "bookie" as

10   defendant contends. Dr. Potenza did not interview David Corsello,

11   and apparently had no evidence, other than defendant's statements,

12   regarding David Corsello or his activities, or the content of any

13   phone calls between defendant and David Corsello.

14   <u>Letters</u>: Dr. Potenza cites letters that were obtained by

15   defendant in connection with his sentencing as another basis for his

16   Report. Defense counsel also asserts that the letters attest to

17   defendant's "addictions to gambling and drugs." (Def. Pos. 20

18   (citing Exhs. E-H, J).) Such reliance on these letters is misplaced.

19   Many of the writers have no independent knowledge of defendant's

20   alleged gambling addiction or only provide information that – once

21   again — comes from defendant himself.[3]

22   

23   [3] The letter writers either: (a) had no information about any
     gambling addiction and only learned of it in connection with
24   defendant's sentencing (<u>e.g.</u>, Mark Gold; Jeffrey Feldman; Lindsay
     Santos (who, nonetheless, says "I do not, in any way, think that what
25   [defendant] did is excusable. [] I am sad that he made the <u>choices</u>
     that he made.")(emphasis added)); (b) were mental health
26   professionals providing therapy to defendant for other issues and saw
     no indication of any gambling addiction (<u>e.g.</u>, Paul Hersh); (c) knew
27   defendant gambled in college and as a young adult but saw no reason
     to be concerned about it and had no knowledge of any more recent
28   gambling (Hector Roman); (d) have no knowledge of defendant's

6

In sum, the Report does not establish that defendant had a gambling disorder, let alone an addiction.  Nor does it establish that defendant used the $7 million-plus that he stole to gamble and not for other purposes, such as funding his high-flying lifestyle (described in the letters submitted by GSO employees who knew him). Defendant's gambling was a choice he made.  That he could control his gambling is clear from that fact that he kept enough money to pay for his expensive house, exotic vacations, and other expenses.

Even if defendant gambled, he could have stopped gambling if he had chosen to do so.  Defendant was sophisticated and highly intelligent. He was surrounded by family, friends, and business colleagues whom he could have turned to for help.  Indeed, during the time that defendant was a partner at GSO, he would have been aware of situations in which GSO employees sought assistance with personal issues and received support and guidance from the firm.  Defendant admits that his business partners and family would have helped him if he had reached out to them.  (Def. Pos. 11.)  Defendant has no explanation for why he did not.[4]

Apparently, simply deciding to stop gambling and start treatment was all that was needed to end the "addiction" that defendant says compelled his to steal from his clients.  Defendant states that after he learned in May 2016 that his thefts had been discovered – and only

gambling (Mike Lederer ("I cannot say one way or the other as to why [defendant] committed these crimes, or is there truly any justification or excuse for the behavior"); or (e) provide no independent information about gambling by defendant (Joyce Schwartz Welkis; Brian Gold).

[4] Nor does defendant have any explanation for why he lied about his income on his tax returns or why he lied on a loan application that he submitted to the Banc of California. (See Government's Position re Sentencing (CR 22) at 22, Exh. E.)

1   then – he "chose" to seek professional help.  (Def. Pos. Exh. A.)

2   That was all that was required to end his "addiction"; according to

3   defendant, he was "sober" by May 9, 2016.  (Id.)  Not surprisingly,

4   defendant chose not to take this simple step as long as he was

5   getting away with his crimes.

6       **B.    Defendant Did Not "Reveal, Reform, and Rehabilitate" When
              His Thefts Were Discovered**
7

8       Defendant contends that when his "double life came crashing to

9   an end" after one of his victims discovered his thefts, he faced "two

10  choices" — (1) he could "try to continue to conceal and cover-up his

11  actions and live in a world of denial" or (2) he "could reveal,

12  reform and rehabilitate" — and he chose the latter. (Def. Pos. 1.)

13  This claim is transparently and verifiably false.

14      Defendant's criminal conduct was only unmasked after one of his

15  clients left GSO and the client's new business manager uncovered what

16  defendant had done.  When confronted with the client's allegations

17  that defendant had stolen millions from him/her, defendant repeatedly

18  lied to his partners by professing his innocence and made a series of

19  wild accusations about the client, accusing him/her of being in the

20  throes of drug addiction and of being mentally unstable.  Defendant

21  was subsequently interviewed by counsel for GSO and lied to him as

22  well.  Defendant even agreed to take a polygraph test, in an apparent

23  effort to lull GSO management into believing that defendant had done

24  nothing wrong.  He utterly failed the polygraph test.

25      Moreover, far from demonstrating that he was "thankful" because

26  he "was finally caught," (Def. Pos. Exh. C) defendant was entirely

27  uncooperative when it came to untangling the damage that he had done

28  to GSO's business (damage that he does not even remotely acknowledge

8

in his 50-page sentencing brief).  He failed to identify those clients from whom he looted money, and, as a result, GSO was forced, through its counsel, to conduct an expensive and time-consuming investigation in an attempt to identify those clients who were victims of defendant's embezzlements and the extent of the damage that defendant had inflicted on his victims due to his thievery.

Defendant also claims that he "proactively" approached the U.S. Attorney's Office ("USAO") to enter into a pre-indictment plea agreement.  (Def. Pos. 1, 13.)  In fact, although defendant's crimes were discovered in April 2016, defendant did <u>not</u> come to the USAO then to face up to his crimes.  He only came <u>after</u> he found out from counsel for GSO that the government was aware of his criminal conduct and addressing it.  Once he learned in July 2016 that criminal charges were unavoidable, defendant hurried into the USAO in order to lay the groundwork for the very sentencing argument he is now making.  Defendant also claims special credit for having agreed to sign closing agreements assessing the taxes and penalties that he owes and "agreeing" to give up his CPA license.  (Def. Pos. 1-2, 39.)  This, too, is simply "agreeing" to the inevitable.

Defendant's statements about his "cooperation" with the government are false and misleading.  Defendant states that he "offered to cooperate with the government's investigation and toward that end met with the IRS agents twice and made monitored phone calls at their behest."  (Def. Pos. 13.)  This is untrue.  The government needed no help with its investigation; by the time defendant approached the government through his counsel in July 2016, the government had already obtained sufficient evidence to charge defendant with embezzlement and tax offenses.  The government did not

ask for defendant's cooperation, and did not offer a cooperation plea agreement.  Defendant implored the government to allow him to cooperate in order to find a way to argue for a reduced sentence. Although the government was skeptical of the cooperation defendant offered, in the interests of fairness it nonetheless allowed defendant to make the monitored calls he repeatedly proposed, at some expense and inconvenience to the government.  As the government expected, these calls produced nothing of value.

To this date, defendant has never apologized personally to any of his victims or acknowledged his wrongdoing to them.  His expressions of remorse have been limited to self-serving acts like the "apology" he arranged to have published on the Hollywood Reporter website on the eve of his sentencing date.

In short, defendant has never "chosen" to do the right thing in this case; and every expression of remorse he has made and every purported act of self-improvement he has taken occurred only after he realized he had no "choice" to do otherwise because his seven years of criminal behavior had been exposed, he eventually figured out that his lies were not going to get him out of the trouble he was in, and he knew he was going to face an eventual reckoning for his crimes.

### C.   A Significant Sentence Is Necessary to Achieve General Deterrence

Defendant is correct that the embezzlements he committed have received substantial publicity.  But he is wrong when he suggests that the publicity regarding his conduct will provide deterrence. What provides deterrence is the sentence that is imposed to punish such wrongful conduct.  The government respectfully submits that persons tempted to embezzle from their clients and companies will not

10

be deterred by the sentence defendant proposes — a sentence that would require defendant to serve only a little more than 9 months in custody as the price for stealing over $7 million, grievously harming a venerable business, and destroying the livelihoods of many of that business' now-former employees.[5]

Defendant also contends that the "Guest Column" he published on the Hollywood Reporter website satisfies the statutory goal of deterrence because it has been viewed over 20,000 times. (Def. Pos. 40.) Again, the fact that defendant admitted stealing from his clients at a time when he was positioning himself for sentencing does not create deterrence. Deterrence will be created by the sentence that is imposed as a sanction for these crimes and the publicity the sentence receives.

**D.    A Within-Guidelines Sentence Will <u>Avoid</u> Sentencing Disparity, Not Create it as Defendant Contends**

Defendant argues that a below-guidelines sentence "is required" here to avoid unwarranted sentencing disparities. (Def. Pos. 43.) He cites four out-of-district cases that he claims are similar to his case, in which below-guidelines sentences were imposed. Not only does defendant make a mistake when he relies on these out-of-district cases because they are <u>not</u> similar, as discussed below, he also ignores cases <u>from this district</u> in which variances based on gambling addictions were denied.

---

[5] Defendant proposes a custodial sentence of 12 months and a day (366 days). Defendant's request for the additional day is really a request to <u>reduce</u> his sentence because it makes him eligible for a "good conduct" reduction of the sentence imposed. With good conduct, defendant's sentence will be reduced by 47 days. The remaining 319 days of his proposed sentence would be further reduced by 32 days because defendant would be eligible for home confinement for the last 10% of his sentence under 18 U.S.C. § 3624(c).

For instance, in <u>United States v. Genis</u>, CR 16-509-DSF, Genis pleaded guilty to two misdemeanors based on his failure to file tax returns, resulting in a tax loss of $679,958.  The Court rejected his request for a variance based on his gambling addiction and imposed the statutory maximum sentence of 24 months.  In <u>United States v. Lee</u>, CR 15-01-DOC, Lee embezzled a total of $4 million from three companies.  Lee asserted that his gambling addiction caused him to steal the money, which he wagered in Las Vegas and at local casinos. The Court denied a variance on this ground and sentenced defendant to a within-guidelines sentence of 121 months.  In <u>United States v. Ruderman</u>, CR 09-757-JFW, Ruderman used his hedge funds to fraudulently obtain $7 million of investor funds in a securities-fraud Ponzi scheme.  Ruderman presented evidence of a gambling addiction and asked for a variance on this ground.  The Court rejected the request and sentenced Ruderman to a within-guidelines sentence of 121 months.  In <u>United States v. Ransdell</u>, CR 13-680-GW, Ransdell embezzled $2.45 million from a television production company.  Ransdell asserted that he had stolen the money to pay his debts from gambling, to which he was addicted.  The Court denied a variance on this ground (although it did grant a small variance on other grounds), and sentenced defendant to 24 months in custody. Significantly, here defendant caused far greater losses and harm than did Genis, Lee, Ruderman and Ransdell, but defendant asks for a far lower sentence (requiring a 13-level variance cutting the low end of his advisory guidelines range by over 80%) than each of those four individuals received.

The facts in the out-of-district cases that defendant cites differ significantly from the facts in defendant's case and do not

1    support his argument that, if they received variances, he should,

2    too.  (Def. Pos. 43-45.)  To begin with, defendant here caused

3    substantially greater losses ($8.6 million) than did the defendants

4    in United States v. Decresenzo, CR 14-230-JBA (D. Conn.); United

5    States v. Dikaria, 50 F. Supp. 3d 1029 (E.D. Wis. 2014); and United

6    States v. Peterson, 363 F. Supp. 2d 1060 (E.D. Wis. 2005).  Those

7    defendants caused losses of $106,028; $1 million; and $81,497,

8    respectively.  These loss amounts are small fractions of the

9    staggering loss of $8,657,268 caused by defendant in this case, a

10   figure that does not even include the harm caused to GSO's future

11   business prospects and to the GSO employees who had to be laid off

12   because of the downturn in GSO's business that occurred when

13   defendant's crimes took their toll on the firm's reputation.  In the

14   remaining case cited by defendant, United States v. Caspersen, CR 16-

15   414-JSR (S.D.N.Y.), Caspersen gambled with $36 million of investor

16   funds, but — unlike defendant here — Caspersen also gambled and lost

17   $23 million of his own money.  Here, defendant has provided no

18   evidence that he gambled with the money he stole other than his own

19   statements; even if he did gamble with the stolen money, he was able

20   to safeguard plenty of money to pay for his large house, his lavish

21   vacations, and other luxuries.  This also distinguishes Dikaria;

22   Dikaria gambled and lost the $300,000 in her husband's retirement

23   account in addition to the $1 million that she embezzled.  Moreover,

24   Decresenzo had been attending Gamblers Anonymous (GA) for years

25   before he committed his offense, and Peterson had attended more than

26   100 GA meetings by the time of his sentencing.  Given these facts,

27   Decresenzo, Dikaria, Peterson, and Caspersen, are not instructive for

28   the instant case.

### E. The "Substantial Price" Defendant Contends he has already Paid for his Crimes Is the Natural Consequence of His Own Actions and Does Not Amount to the Just Punishment Contemplated by § 3553(a)

Defendant contends that he has "already paid, and will continue to pay, a substantial price" for his crimes. (Def. Pos. 39.)  What defendant is referring to – the restitution and evaded taxes that he will owe – is not a "price" for his crimes.  It is merely the requirement that he pay back what he stole, and pay the taxes that he owes.  These sanctions are not punishments – they merely undo defendant's unjust enrichment from his crimes and require him to meet his obligations under the tax laws.  Just punishment is something else, namely a criminal sanction for his unlawful conduct.

Defendant argues that his sentence should be lessened because he is already suffering the "penalty" of serious consequences to his family, including the end of his marriage.  (Id.)  This argument is not well taken.  The consequences to his family are the result of defendant's own actions, and could have been avoided if defendant had not committed his crimes.  Moreover, every defendant's family suffers when a family member commits a crime.  There is nothing special about this defendant or his family circumstances that warrants special leniency.  What does distinguish this case is that defendant's actions harmed many other families in addition to his own – the families of the GSO employees who have lost their jobs because of the damage to GSO's business that defendant caused.  This is an aggravating factor, not a mitigating one.

## III. CONCLUSION

Given the magnitude of defendant's crimes and the losses he has inflicted, the year-and-a-day sentence defendant proposes would be a

"slap on the wrist" that belittles the harms suffered by his victims and fails to provide them with justice.  The government concurs in the recommendation of the Probation Officer that a 63-month sentence is reasonable, and not more than necessary, to provide just punishment, recognize the seriousness of defendant's offenses,

///

///

///

provide respect for the law, and provide deterrence.[6]  For all the reasons set forth in the government's Position re Sentencing and this Reply to defendant's Position re Sentencing, the government respectfully requests that the Court sentence defendant to 63 months in custody, the low end of the applicable advisory sentencing guidelines range.


Dated: May 1, 2017          Respectfully submitted,

                            SANDRA R. BROWN
                            Acting United States Attorney

                            LAWRENCE S. MIDDLETON
                            Assistant United States Attorney
                            Chief, Criminal Division


                            _____/s/ *Ranee A. Katzenstein*_____
                            RANEE A. KATZENSTEIN
                            Assistant United States Attorney
                            Chief Assistant for Trials, Integrity &
                            Professionalism

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

---

[6] Defendant has attached a "sentencing recommendation" from the Aleph Institute, which he sets up as an alternative to the recommendation submitted by the United States Probation Office (USPO). (Def. Pos. 30-32; Exh. I.)  The Court should give no weight to this alternative "sentencing recommendation."  First, the USPO receives input from both the government and the defendant before it drafts its report and recommendation; the Aleph Institute received direction and information from only the defendant.  Second, the USPO prepares reports and recommendations in every criminal case brought in the United States and thus has a broad range of information on which to rest its sentencing recommendations; the Aleph Institute is only involved in a small number of cases, which are apparently self-selected.  Third, the Aleph Institute is not subject to the statutory controls that regulate publicly-accountable government officials such as US probation officers, ensuring objectivity and preventing conflicts of interest.  The fact that defendant shared the Presentence Report, which is a confidential document filed under seal, with the Aleph Institute, raises questions about the propriety and independence of this alternative "sentencing recommendation" that defendant sought out to support his extremely lenient sentencing proposal.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28